UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------X

Guy Molinari, William C. Thompson, Jr.,
individually and in his official capacity
as the New York City Comptroller, Betsy
Gotbaum, individually and in her official
capacity as Public Advocate for the City
of New York, Bill de Blasio, individually
and in his official capacity as a member
of the New York City Council, Letitia
James, individually and in her official
capacity as a member of the New York City
Council, Charles Barron, individually and
in his capacity as a member of the New
York City Council, Rosalie Caliendo,
Phillip Depaolo, Philip Foglia, Kent
Lebsock, Mike Long, Tom Long, Sarah Lyons,
Andrea Rich, Ida Sanoff, Gloria Smith,
Eric Snyder, Luvenia Suber, Kenneth J.
Baer, Kenneth A. Diamondstone, Peter
Gleason, Mark Winston Griffith, Ari
Hoffnung, Stanley Kalathara, Alfonso
Quiroz, Ydanis Rodriguez, Jo Anne Simon,
New York Public Interest Research Group,
Inc., U.S. Term Limits, and Responsible
New York,

                    Plaintiffs,                CV-08-4539 (CPS)(JO)

     - against -                               (CORRECTED)
                                               MEMORANDUM
                                               AND ORDER

Michael R. Bloomberg, in his official
capacity as Mayor of New York City,
Christine C. Quinn, in her official
capacity as Speaker of the New York City
Council, The New York City Council, The
City of New York, James J. Sampel, in his
official capacity as president of the
Commissioners of Elections for the Board
of Elections in New York City, and Board
of Elections of New York City,

                    Defendants.

-------------------------------------------X
SIFTON, Senior Judge.

Plaintiffs Guy Molinari, William C. Thompson, Jr.
individually and in his official capacity as the New York City
Comptroller, Betsy Gotbaum ("Gotbaum"), individually and in her
official capacity as Public Advocate for the City of New York,
Bill de Blasio ("de Blasio"), individually and in his official
capacity as a member of the New York City Council, Letitia James
("James"), individually and in her official capacity as a member
of the New York City Council, Charles Barron ("Barron"),
individually and in his official capacity as a member of the New
York City Council, Rosalie Caliendo, Phillip Depaolo, Philip
Foglia, Kent Lebsock, Mike Long, Tom Long, Sarah Lyons, Andrea
Rich, Ida Sanoff, Gloria Smith, Eric Snyder, Luvenia Suber,
Kenneth J. Baer, Kenneth A. Diamondstone, Peter Gleason, Mark
Winston Griffith, Ari Hoffnung, Stanley Kalathara, Alfonso
Quiroz, Ydanis Rodriguez, Jo Anne Simon, New York Public Interest
Research Group, Inc. ("NYPIRG"), U.S. Term Limits, and
Responsible New York ("plaintiffs") commenced this action against
Michael R. Bloomberg ("Mayor Bloomberg"), in his official
capacity as mayor of New York City, Christine C. Quinn, in her
official capacity as Speaker of the New York City Council
("Speaker Quinn"), The New York City Council, The City of New
York, James J. Sampel, in his official capacity as president of
the Commissioners of Elections for the Board of Elections in New
York City, and Board of Elections of New York City

("defendants"). Plaintiffs or some of them allege against some or all of the defendants (1) deprivation of asserted First Amendment rights to a meaningful vote in violation of 42 U.S.C. § 1983 ("§ 1983") (Claim I); (2) chilling of asserted First Amendment rights to political expression in violation of § 1983 (Claim II); (3) denial of asserted First Amendment rights to access to the ballot in violation of § 1983 (Claim III); (4) denial of asserted Fourteenth Amendment rights to Due Process in violation of § 1983 (Claim IV); (5) disenfranchisement of voters in violation of Article I, § 1 of the New York State Constitution (Claim V); (6) violation of the requirement of Municipal Home Rule Law § 23(2) that voters approve fundamental changes to the City Council by referendum (Claim VI); (7) violation of the requirement of City Charter § 38 that voters approve fundamental changes to their electoral and governmental structure (Claim VII); (8) actions in excess of the powers of the City Council under Municipal Home Rule Law §§ 10, 23 and City Charter §§ 23, 38, and 40 (Claim VIII); (9) violating the public policy of New York established in City Charter §§ 38, 1137, 1138 (Claim IX); (10) conflicts of interest on the part of Council Members in violation of City Charter § 2604(b)(3) (Claim X); (11) conflicts of interest on the part of Mayor Bloomberg in violation of City Charter § 2604(b)(3) (Claim XI); and (12) knowingly aiding and abetting the Mayor's violations of City Charter § 2604(b)(3) in violation of City

Charter § 2604(b)(2) and Conflicts Board Rule 1-13(d)(Claim XII).
Plaintiffs seek a declaratory judgment that the term-limits
amendment is unconstitutional under the United States and New
York State Constitutions, a declaratory judgment that the term-
limits amendment violates the Municipal Home Rule Law and the
City Charter, a declaratory judgment that the term-limits
amendment is invalid because it was enacted in violation of City
Charter conflicts provisions, an injunction barring the Board of
Elections from listing term-limited city officials on the ballot
in the 2009 City elections, costs, and attorneys' fees.

Now before the Court is defendants' motion to transfer this
action to the Southern District of New York. For the reasons
stated below, the motion is denied.

## BACKGROUND

The following facts are drawn from the Amended Complaint and
the parties' submissions in connection with this motion. Disputes
are noted.

### The Parties

Five categories of plaintiffs are represented in this
action. Complaint at ¶ 162 ("Compl."). One group includes elected
officials who opposed the term-limits amendment, such as the
Comptroller, City Council Members, and the Public Advocate. *Id.*

at ¶ 163. Another group includes voters from each of the five boroughs of New York City who voted to impose term limits in the 1993 Referendum and to preserve them in the 1996 Referendum, and who allege that they would vote to restore them if given an opportunity. *Id.* at ¶ 164. A third group includes prospective candidates for public office who alleged that, relying on application of the term-limits rule to certain incumbents, launched their campaigns, raised and spent money, and committed to strategies relating to the election, and whose chances of winning are now reduced, given the advantage enjoyed by incumbents. *Id.* at ¶ 165. A fourth group includes a good-government group, NYPIRG, which seeks to preserve the rights of all New Yorkers and works to safeguard the public against governmental abuses of power. *Id.* at ¶ 166. The fifth group includes organizations, such as U.S. Term Limits, which allegedly invested significant resources to support the two-term limit ratified in the 1993 and 1996 referenda, and claims that the votes cast then cannot now be reversed by the Mayor and City Council. *Id.* at ¶ 167. All five groups believe that this issue of term limits should be submitted to the voters in the event that the matter is not resolved by this Court. Transcript of Proceedings, November 19, 2008, at 9:19-21.

*Background*

In 1993, non-party New Yorkers for Term Limits, plaintiff U.S. Term Limits, and other organizations participated in a campaign to place the issue of a two-term limit for elected City officials on the November 1993 ballot in the form of a City-wide referendum. *Id.* at ¶ 64. New Yorkers for Term Limits gathered over 130,000 signatures in support of the referendum and allegedly spent approximately $1,000,000 to do so. *Id.* at ¶ 68. Voters adopted the proposed change by a vote of 59% in favor versus 41% against, with over one million votes cast. *Id.* at ¶ 71. The City Charter was accordingly amended to state that it was the public policy of the City of New York to limit to not more than eight consecutive years the time the mayor, public advocate, comptroller, borough presidents or council members may serve.[1] *Id.* at ¶ 73.

In 1996, City Council Members presented second referendum proposal to the voters altering the term-limits rule for City

---

[1]As enacted pursuant to the 1993 Referendum, the city Charter's term-limits provisions provided, in pertinent part:

§ 1137. Public Policy. It is hereby declared to be the public policy of the City of New York to limit to not more than eight consecutive years the time elected officials can serve as mayor, public advocate, comptroller, borough president and council member so that elected representatives are "citizen representatives" who are responsive to the needs of the people and are not career politicians.

§ 1138. Term Limits. Notwithstanding any provision to the contrary contained in this charter, no person shall be eligible to be elected or to serve in the office of mayor, public advocate, comptroller, borough president or council member if that person has previously held such office for two or more consecutive terms (including in the case of council member at least one four-year term), unless one full term or more has elapsed since that person last held such office...

Council Members from two consecutive terms to three consecutive terms. New Yorkers voted against the proposal by a margin of 54% against versus 46% in favor, with over one million votes cast. *Id.* at ¶ 78.

Under the two-term rule, defendants Mayor Bloomberg and Speaker Quinn, and plaintiffs, the Comptroller Thompson, Public Advocate Gotbaum, Council Members de Blasio and Barron, four of the five current Borough Presidents, who are not parties to this litigation, and 32 other City Council Members are precluded from seeking re-election to their respective offices in the 2009 election cycle. *Id.* at ¶ 79.

Although Mayor Bloomberg and Speaker Quinn made statements supporting term limits, both are said to have begun to explore the option of extending term limits earlier this year. *Id.* at ¶¶ 83, 90, 89-98. On October 2, 2008, Mayor Bloomberg and Speaker Quinn announced that a new term-limits bill would be introduced in the City Council. *Id.* at ¶ 99-100. Numerous good-government groups, media commentators, and government officials immediately expressed opposition to the change in the proposed law. *Id.* at ¶ 103-108. Following opposition by a prominent supporter of term limits, Ronald Lauder, Mayor Bloomberg caused a change in the proposed bill adding language stating that the proposed bill, if enacted, would be repealed if the voters chose to repeal it in a referendum expected to take place in 2010. *Id.* at ¶ 115-117.

The Term-Limits Bill ("the Bill"), seeking to amend New York City Charter §§ 1137-38, was introduced on October 7, 2008. *Id.* at ¶ 120. Public committee hearings on the Bill were held on October 16, 2008, and October 17, 2008. *Id.* at ¶ 121. During this time, a number of Council Members introduced alternative proposals seeking to resolve the term-limits debate through various proposals not requiring a council vote. *Id.* at ¶ 125.

On October 9, 2008, plaintiffs de Blasio, James, and Gotbaum submitted a request for an advisory opinion to the Conflicts of Interest Board of the City of New York (the "Conflicts Board"), seeking an opinion on whether the City Charter's conflicts-of-interest provisions[2] would bar term-limited elected City officials from using their positions to advance, support, or enact legislation that would enable them to serve additional terms in office. *Id.* at ¶ 128. Also on October 9, non-party Common Cause/NY and plaintiff NYPIRG each submitted a complaint to the conflicts board alleging that Mayor Bloomberg had improperly used his position for private or personal advantage. *Id.* at ¶ 130. On October 15, 2008, the Conflicts Board issued an

---

[2]Section 2604(b)(3) of the New York City Charter provides, in relevant part:
> No public servant shall use or attempt to use his or her position as a public servant to obtain any financial gain... or... private or personal advantage, direct or indirect, for the public servant or any person or firm associated with the public servant.

Section 2604(b)(2) of the New York City Charter prohibits a City public servant from having
> any financial or other private interest, direct or indirect, which is in conflict with the proper discharge of his or her official duties.

advisory opinion concluding that no violation of the conflicts laws existed or would occur. *Id.* at ¶ 132. On October 22, 2008, plaintiffs de Blasio and James commenced a special proceeding against the Conflicts Board and the City Council pursuant to CPLR Article 78, seeking judicial review of the advisory opinion. *Id.* at ¶ 138. The Corporation Council for the New York City Law Department argued that the petition should be dismissed, on the ground that the proper procedure for raising the conflict claim would be a declaratory judgment action challenging the validity of the Bill after its enactment. *Id.* at ¶ 140. Justice Silbermann of the Supreme Court of New York, New York County, denied the application for a temporary restraining order postponing the Council vote and declined to issue an order to show cause, finding the matter not then justiciable. *Id.* at ¶ 142.

On October 23, 2008, the term-limits bill was debated by members of defendant Council. *Id.* at ¶ 144. At this meeting, opponents of the Bill proposed an alternative that would have required the term-limits change to be put to a voter referendum. *Id.* at ¶ 147. After a debate, the City Council voted 28 to 22, with one abstention, against this alternative. *Id.* at ¶ 148. The Council then voted 29 to 22 to approve Local Law 51 of 2008, changing the term-limits rule to permit officials to serve three

rather than two terms.[3] *Id.* at ¶ 149. Of the 29 council members voting in favor of the Bill, 22 would have been barred from seeking reelection in 2009 under the previous law. *Id.* at ¶ 150.

*Procedural History*

On October 22, 2008, one day prior to the City Council's vote, a group of New York City public school teachers, represented by Edward Fagan,[4] filed a Complaint in the Southern District of New York against Michael Bloomberg, individually and as the Mayor of New York City, Christine Quinn, individually and as Speaker of the City Council, and all members of the City Council. That case is entitled *Scheiner et al. v. Bloomberg et al.*, 08-CV-9072, and is assigned to Judge Stein ("the Scheiner action"). The *Scheiner* complaint sets forth two claims for

---

[3]As amended by the Bill, the term limits provisions in the New York City Charter read as follows, in pertinent part:

§ 1137. It is hereby declared to be the public policy of the city of New York to limit the time elected officials can serve as mayor, public advocate, comptroller, borough president and council member so that elected representatives are "citizen representatives" who are responsive to the needs of the people and are not career politicians. It is further declared that this policy is most appropriately served by limiting the time such officials can serve to not more than three full consecutive terms.

§ 1138. [N]o person shall be eligible to be elected to or serve in the office of mayor, public advocate, comptroller, borough president or council member if that person has previously held such office for three or more full consecutive terms, unless one full term or more has elapsed since that person last held such office...

[4]Mr. Fagan was disbarred on December 11, 2008, by the Appellate Division, First Department. An order to show cause has been issued in this action returnable January 5, 2009, why Mr. Fagan should not be relieved as an attorney for certain intervenors in this action.

relief. The first claims that the defendants therein violated their oath of office by not submitting the term limits question to a referendum. The second alleges discrimination against plaintiffs, infringement of the plaintiffs' right to vote, and violation of plaintiffs' due process rights as New York City public school teachers. The complaint seeks a declaratory judgment that defendants' actions constituted a violation of their oath of office, and an injunction barring defendants from making any changes to term limits without a voter referendum. On October 31, 2008, at an initial case conference before Judge Stein, a schedule was set for dispositive motions. Also on October 31, plaintiffs discontinued their action against all defendant Council members who had voted against the change to the term-limits law. On November 7, 2008, the defendants in the *Scheiner* action filed a motion to dismiss the complaint.

On November 10, 2008, the plaintiffs filed their complaint in this proceeding in the Eastern District of New York, requesting that the case be assigned to Judge Korman as a case related to two prior lawsuits addressing issues similar to the ones expected to be raised in this case. On November 12, 2008, Magistrate Judge James Orenstein issued an order directing the plaintiffs to show cause why the case should not be reassigned to a randomly selected judge, on the ground that this case was not related to cases previously before Judge Korman within the

meaning of Local Civil Rule 50.3(a)-(b). On November 13, 2008, plaintiffs consented to the reassignment of the case to a randomly selected Judge. Also on November 13, counsel for plaintiffs in the action before Judge Stein wrote to Magistrate Judge Orenstein stating his belief that the two cases should be consolidated before Judge Stein, and his intention to move to intervene in this action to seek that relief.

On November 14, 2008, the case was assigned to me pursuant to random selection. On the same day, plaintiffs requested that I schedule a conference in order to set an expedited briefing schedule, pursuant to which the parties would file cross-motions for summary judgment to be heard on December 23, 2008. On November 17, 2008, plaintiffs filed an Amended Complaint.[5] Also on November 17, defendants requested a conference to discuss their requests to transfer the matter to the Southern District of New York, to permit defendants to have until December 15, 2008 to move to dismiss this action, and to postpone the setting of a schedule for cross-motions for summary judgment until after the defendants' preliminary motions had been resolved.

On November 19, 2008, the parties and proposed intervenors

---

[5]The claims made in the Amended Complaint are those described above. The original complaint contained four claims for relief: (1) deprivation of the right to a meaningful vote in violation of the First and Fourteenth Amendments; (2) chilling of political expression in violation of the First and Fourteenth Amendments; (3) denial of access to the ballot in violation of the First and Fourteenth Amendments; and (4) denial of due process in violation of the Fourteenth Amendment.

came before me for a status conference to discuss the request to transfer the action to the Southern District and to set a briefing schedule. At that conference, I granted the motion to intervene for the limited purpose of supporting the motion to transfer and ordered the plaintiffs and intervenors to Show Cause on December 4, 2008, why the case should not be transferred. I stated that plaintiffs' proposed motion for summary judgment and defendants' motion to dismiss would not be delayed pending the resolution of defendants' motion to transfer or dismiss, and fixed dates for the dispositive cross-motions in December, and extended the time for defendants to answer or move to December 12. On December 4, I heard argument on the motion to transfer. For the reasons set forth below, the motion to transfer is denied.

## DISCUSSION

28 U.S.C. § 1404(a) provides, in pertinent part, that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division in which it might have been brought." the purpose of section 1404(a) is to prevent waste "of time, energy and money" and "to protect litigants, witnesses and the public against unnecessary inconvenience and expense." *Continental Grain Co. v. Barge FBL-585*, 364 U.S. 19, 27, 80 S. Ct. 1470, 4 L. Ed. 2d 1540 (1960). Courts engage in a two-step

inquiry when ruling on transfer motions. "First, a court must determine whether the transferee district is one in which the action could have been brought;" and "[s]econd, a court must determine whether the goals of convenience and interests of justice are met by transfer." *Colabufo v. Continental Casualty Co.*, 2006 U.S. Dist. LEXIS 28957, at *5 (E.D.N.Y. 2006). Venue is proper in the Southern District, because several defendants reside in that District and the Council Vote in question took place in its territorial limits[6]

"[M]otions for transfer lie within the broad discretion of the district court and are determined upon notions of convenience and fairness on a case-by-case basis." *In Re: Cuyahoga Equpment Corp. v. United States et al.*, 980 F.2d 110, 117 (2d Cir. 1992) (citing *Stewart Org. Inc. v. Ricoh Corp.*, 487 U.S. 22, 29, 101 L.Ed. 2d 22, 108 S.Ct. 2239 (1988)). The plaintiff's choice of forum is ordinarily accorded "great weight." *D.H. Blair & Co., Inc. v. Gottdiener*, 462 F.3d 95, 107 (2d Cir. 2006). The moving party has the burden to show clearly that the proposed transfer would be more convenient and would better serve the interests of justice. *Goodman v. Schmalz*, 80 F.R.D. 296, 300-301 (E.D.N.Y.

---

[6]"A civil action wherein jurisdiction is not founded solely on diversity of citizenship may, except as otherwise provided by law, be brought only in (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) a judicial district in which any defendant may be found, if there is no district in which the action may otherwise be brought." 28 U.S.C. 1391(b).

1978). "[A] court should not disturb a plaintiff's choice of forum unless the defendants make a clear and convincing showing that the balance of convenience favors defendants' choice." *Linzer v. EMI Blackwood Music, Inc.*, 904 F.Supp. 207, 216 (S.D.N.Y. 1995) (quoting *Hubbell Inc. v. Pass & Seymour, Inc.*, 883 F. Supp. 955, 962 (S.D.N.Y. 1995)). The defendant moving for transfer bears the heavy burden of showing "that transfer is in the best interests of the litigation." *In re Nematron Corp. Secs. Litig.*, 30 F. Supp. 2d 397, 400 (S.D.N.Y. 1998) (citation omitted). District courts must also consider "public interest factors," *Stewart Org*, 487 U.S. at 30, including the "private and public economy of avoiding multiple cases on the same issue." *Employers Ins. of Aausau et al. v. Fox Entertainment Group, Inc., et al.*, 2008 U.S. Dist. LEXIS 76570 at *11 (S.D.N.Y. 2008).

The parties agree that there would be little difference in convenience between the two forums.[7]

---

[7] When deciding whether to transfer venue, the following factors are appropriately considered:
> (1) the convenience of witnesses; (2) the location of relevant documents and the relative ease of access to sources of proof; (3) the convenience of the parties; (4) the locus of the operative facts; (5) the availability of process to compel attendance of unwilling witnesses; (6) the relative means of the parties; (7) a forum's familiarity with the governing law; (8) the weight accorded a plaintiff's choice of forum; and (9) trial efficiency and the interests of justice, based on the totality of the circumstances.

*Wilshire Credit Corp. v. Barrett Capital Mgmt. Corp.*, 976 F. Supp. 174, 181 (W.D.N.Y. 1997); *Lewis v. C.R.I., Inc.*, 2003 U.S. Dist. LEXIS 6362, at *7 (S.D.N.Y. 2003).

It is difficult to take seriously a concern about convenience in this case, given the close proximity of the Eastern and the Southern Districts. Section 1404(a) "was designed and reserved for those instances where the transfer was sought to a District Court substantially distant from the district where the action had been instituted; otherwise it is difficult to

Plaintiffs argue that defendants have not met their "heavy burden" necessary to reverse the plaintiffs' choice of forum. *Colabufo*, 2006 U.S. Dist. LEXIS 28957, at *5. Defendants argue that plaintiffs' choice of forum should not be given great weight "where the plaintiff does not reside in the chosen forum and/or where significant operative facts did not occur there." *Hilti Aktiengesellschaft v. Milwaukee Elec. Tool Corp.*, 2004 U.S. Dist. LEXIS 16373, at * 22 (E.D.N.Y. 2004) (citations omitted). Defendants state that a significant number of plaintiffs neither reside nor have their principal places of business in the Eastern District (8 of 27 plaintiffs) and the operative facts giving rise to the claim occurred in the Southern District, where the City Council voted to amend the term-limits law. Plaintiffs respond that "[t]he fact that the other plaintiff[s]... reside[] in the nearby District... does not alter the conclusion that plaintiffs' choice of forum is entitled to substantial deference." *Computer Express Int'l, Ltd. v. MicronPC, LLC*, 2001 U.S. Dist. LEXIS 22584, at *24, n.13 (E.D.N.Y. 2001). Moreover, plaintiffs argue

---

imagine that there could be real inconvenience to the parties or witnesses." *Schwartz v. Marriott Hotel Servs., Inc.*, 186 F.Supp.2d 245, 252 (E.D.N.Y. 2002) (citation omitted). It is no more difficult for the parties to litigate in the Eastern or the Southern District. Other factors are similarly neutral. There is no difference in the relative convenience of accessing proof; the locus of operative facts is the City of New York; both Districts have equal power to compel attendance of unwilling witnesses; witnesses are equally able to appear in either forum; and both Districts stand on equal footing regarding the forum's familiarity with governing law. In addition, by voluntarily appearing before this Court on November 19, 2008, the Scheiner plaintiffs waived the privilege to object to venue on convenience grounds. *Mobil Oil Corp v. Dep't of Energy*, 1981 U.S. Dist. LEXIS 9437, at *6 (S.D.N.Y. 1981).

that the locus of operative facts is not the Southern District, but rather all of New York City, as venue is proper "in the district where the effects of the challenged regulations are felt even though the regulations were enacted elsewhere." *Farmland Dairies v. McGuire*, 771 F.Supp. 80, 82 n.3 (S.D.N.Y. 1991). Taking these factors into consideration, I find that plaintiffs' choice of forum should be accorded weight.

This leaves the question whether the cases are related.

## A. Standard for Relatedness

"There is a strong policy favoring the litigation of related claims in the same tribunal." *Eyndham Assocs. v. Bintliff*, 398 F.2d 614, 619 (2d Cir. 1968). "As a general rule, 'where there are two competing lawsuits, the first suit should have priority.'" *Employers Ins. of Aausau et al. v. Fox Entertainment Group, Inc., et al.*, 522 F.3d 271, 274-75 (2d Cir. 2008) (quoting *First City Nat'l Bank & Trust Co. v. Simmons*, 878 F.2d 76, 79 (2d Cir. 1989). This rule conserves judicial resources by avoiding duplicative litigation. *Id.* at 275. "This rule usually applies when identical or substantially similar parties and claims are present in both courts." *In Re Cuyahoga* 980 F.2d at 117. "[T]o permit a situation in which two cases involving precisely the same issues are simultaneously pending in different District Courts leads to the wastefulness of time, energy and money that §

1404(a) was designed to prevent." *Ferens v. John Deere Co.*, 494
U.S. 516, 531, 110 S. Ct. 1274; 108 L. Ed. 2d 443 (1990).
However, recognizing that the gains in efficiency are lost when
the parties or legal issues differ between cases, "courts have
denied motions to transfer under 28 U.S.C. § 1404(a) where the
two cases... do not involve the same parties, *see Generale Bank
v. Wassel*, 779 F. Supp. 310, 313 (S.D.N.Y. 1991) (denying
transfer where plaintiff was not a party to action pending in
transferee forum), or... do not possess complete identity of
legal issues, *see Pall* [*Corp. v. PTI Techs., Inc.*, 992 F. Supp.
196, 202 (S.D.N.Y. 1998)] (denying transfer where one patent case
set forth five claims and seven affirmative defenses and the
other patent case did not)." *NBA Props., Inc. v. Salvino, Inc.*,
2000 U.S. Dist. LEXIS 3799, at *29 (S.D.N.Y. 2000).[8]

Defendants state that both actions "concern an identical set
of operative facts from which overlapping substantive claims
arise." D. Mem. at 8. Plaintiffs argue that the differences

---

[8]The local rules provide some guidance here, although they are not
determinative of the defendants' interest. *United States v. Astra Motor Cars*,
352 F. Supp. 2d 370, 372 (E.D.N.Y. 2005) (the local rules of this court were
"'adopted for the internal management of the case load of the court'" and that
they do not "'vest any rights in litigants or their attorneys.'" (quoting
preamble to Guidelines for the Division of Business Among District Judges,
Eastern District)). Under Local Rule 50.3 a civil case "is 'related' to
another civil case for purposes of this guideline when, because of the
similarity of facts and legal issues or because the cases arise from the same
transactions or events, a substantial saving of judicial resources is likely
to result from assigning both cases to the same judge and magistrate judge."
Loc. Civ. R. 50.3(a). Furthermore, a civil case "shall not be deemed "related"
to another civil case merely because the civil case: (A) involves identical
legal issues, or (B) involves the same parties." Id. Loc. Civ. R. 50.3(b).

between the complaints, one of which contains two claims for
relief, the other of which contains twelve, and the differences
between the parties are cause for denial of the motion. *Orb
Factory, Ltd. v. Design Science Toys, Ltd.*, 6 F. Supp. 2d 203,
210-11 (S.D.N.Y. 1998) (even when there is "a substantial
duplication of claims in the two cases," and a second action
"substantially overlaps the facts inhering in the [first] case,"
transfer should still be denied where "both cases arise from
entirely different complaints against [defendants by] different
plaintiffs."). Moreover, plaintiffs argue, although both actions
may "concern essentially the same transactions, the legal rights
are different." *Wellington Computer Graphics, Inc. v. Modell*, 315
F. Supp. 24, 26 (S.D.N.Y. 1970). In order to determine the extent
to which overlapping parties or claims require a finding that the
cases are related, I consider the parties and claims in each case
in turn.


**B. Overlap of Parties and Claims Between the Two Actions**

*1. The Parties*

     The *Scheiner* plaintiffs are "NYC public school teachers
whose due process rights have been and continue to be violated by
and through Defendant Bloomberg's control of the New York City
Public School System." Plaintiffs' Memorandum in Opposition to
Defendants' Transfer Motion Ex. 9 ("P. Mem.") (*Scheiner*

Plaintiffs' Oct. 24, 2008 Letter) at 1. Plaintiffs in this case are not named or implicated in the *Scheiner* action. The *Scheiner* plaintiffs have stated that their grievance is over their disciplinary treatment as school teachers at the hands of Mayor Bloomberg. They have brought this suit to prevent Mayor Bloomberg from being reelected, because Mayor Bloomberg has instituted policies through which the *Scheiner* plaintiffs claim to have been improperly targeted and discriminated against, removed from their schools, subjected to hostile work environments, and confined in unsafe locations as a result of minor disciplinary infractions. *Scheiner* Complaint ¶ 28 n.3; October 31 Hearing Before Judge Stein in the *Scheiner* Action, 12:17-16:3 ("*Scheiner* Hearing"). The *Scheiner* plaintiffs want to prevent Mayor Bloomberg's reelection in order to ensure a change of circumstance for themselves. Stein Hearing at 13:24-14:8. The *Scheiner* plaintiffs, by their own statements, seek to advance a personal interest that is only tangentially related to the legality of the term-limits amendment.

Plaintiffs in this case represent a diverse group of public officials, candidates for public office, voters, and good-government groups. *See* Plaintiffs' Amended Complaint at ¶¶ 24-51 ("Amended Compl."). More than three quarters of the individual plaintiffs reside in the Eastern District. *Id*. Some plaintiffs support Mayor Bloomberg, while others do not. P. Mem. at 13. The

plaintiffs' stated objective is to ensure that New York City voters have an opportunity to decide the term-limits question by a referendum. *See* Amended Compl. at ¶¶ 24-51. Some of the plaintiffs in this case are preparing to run for office in 2009, and have an interest in the speedy resolution of this case to ensure that the matter can be placed on the ballot for a special election in the spring of 2009, in time for them to register as candidates in June of 2009.

It is clear that the plaintiffs in the two actions are distinct.[9] However, the defendants in the two cases are substantially overlapping. Mayor Bloomberg, Speaker Quinn, and the City Council are named in both cases. The *Scheiner* complaint also named 48 other Council Members as defendants (22 of whom have been dropped). The defendants in this case also include the City, the Board of Elections, and the Chair of the Board of Elections. While there are indeed differences between these sets of defendants, the core defendants are the same in the two actions, and are represented by the same counsel.

---

[9]Defendants argue that because the *Scheiner* plaintiffs are suing as teachers and as voters, and the plaintiffs in this action are also suing as voters, the plaintiffs have something important in common. Defendants' Opposition to Plaintiffs' Response to the Order to Show Cause at 5 ("D Opp."). Given that the *Scheiner* plaintiffs themselves have stated that their interest in this action is to ensure that Mayor Bloomberg is not elected in order to change the Education policy in New York City, defendants' argument that the plaintiffs are overlapping is thin. The interest that the *Scheiner* plaintiffs seek to vindicate is less that of voters, than of private individual school teachers seeking to improve their working conditions.

*2. The Claims*

The *Scheiner* complaint asserts two claims: (1) that the defendants violated their "oath of office" by legislatively amending the City's term-limits laws; and (2) "Violation of Civil Rights and Right to Vote."[10] Plaintiffs bring three interrelated types of claims: the first class of claims concerns violations of the First and Fourteenth Amendments to the United States Constitution and Article I, Section 1 of the New York State Constitution forbidding disenfranchisement; the second class concerns violations of State and local laws requiring that questions of the sort raised by the term-limits amendment be submitted to a mandatory voter referendum; and the third class concerns violations of the City Charter's conflict of interest laws. Plaintiffs do not allege any violation of the oath of office. Therefore, the locus of potential overlap is the second *Scheiner* claim.

The second *Scheiner* claim asserts that "defendants' actions are an attempt to infringe upon and in contravention to Plaintiffs' rights to vote in a public referendum on whether or not the law of the City of New York term limits is also a fundamental right." *Scheiner* Compl. at ¶ 49. The *Scheiner* complaint includes a footnote attending the second claim, stating

---

[10]The Scheiner complaint includes a third count, but it is in fact a form of relief, as it requests an injunction. Judge Stein remarked on this error in his October 31 hearing. Stein Hearing at 4:19-20.

that "Defendants' actions are similar to unlawful re-districting plans through which voters' rights have been infringed." *Id.* n.4, citing *Kirkpatrick v. Preisler*, 394 U.S. 526, 89 S. Ct. 1225; 22 L. Ed. 2d 519 (1969) and *Wells v. Rockefeller*, 394 U.S. 542, 89 S. Ct. 1234; 22 L. Ed. 2d 535 (1969). These cases struck down plans for congressional districts that did not properly equalize the number of citizens in each district. Both decisions were founded on the Fourteenth Amendment's guarantee of Equal Protection, and followed on the Court's previous decision in *Reynolds v. Sims,* 377 U.S. 533, 84 S. Ct. 1362; 12 L. Ed. 2d 506 (1964). *See Kirkpatrick*, 394 U.S. at 530; *Wells* at 394 U.S. at 546. In addition, the second *Scheiner* claim asserts that Mayor Bloomberg's actions "are also in furtherance of his continued violation of Plaintiffs' due process and other rights as NYC public school teachers." *Id.* at ¶ 50.

Although both complaints make Fourteenth Amendment claims, there is no overlap between them. Plaintiffs in this action do not make an Equal Protection voting rights challenge of any sort, including the one-person one-vote variety. Furthermore, whereas the *Scheiner* plaintiffs seek redress for violations of Due Process in their treatment as public school teachers, the plaintiffs in this case claim that the Due Process Clause precludes legislators and other elected officials from entrenching themselves in office by voting for increased term-

limits. Amended Compl. at ¶ 236. Although both claims are made under the Due Process clause, the claims are entirely distinct.

It is possible that the *Scheiner* plaintiffs' "right to vote" claim could be construed as a First Amendment Claim. The *Scheiner* claim asserts that plaintiffs have a right to vote on whether the existing term-limits law is a fundamental right. It is unclear what the *Scheiner* plaintiffs mean by claiming that there is a fundamental right to the existence of the term-limits law. Generously interpreted, however, this claim asserts a fundamental right to vote on changes to the term-limits law due to its control of the structure of government. This could be interpreted to implicate the First Amendment.

Plaintiffs in this action make three First Amendment claims in their first, second, and third causes of action. The first cause of action states that "core First Amendment activity - the speech, the effort, the money spent, the time devoted, and the votes ultimately cast [in the 1993 and 1996 Referenda] - was completely nullified" by the term-limits amendment. Amended Compl. at ¶ 201. Plaintiffs assert that this was a violation of "the First Amendment's guarantee of a meaningful right to vote and otherwise participate in the political process." *Id.* at ¶ 204. Plaintiffs' second cause of action states that the "realistic impact of the Term-Limits Amendment will be to limit expression by discouraging New York City voters from initiating

referenda." *Id.* at ¶ 210. The amendment "thereby creates a strong disincentive for engaging in core First Amendment speech and activity," with a resulting chilling of political speech and expression. *Id.* at ¶ 215. Plaintiffs' third cause of action states that the "Mayor and City Council have created a significant disincentive to participation in the referenda process." *Id.* at ¶ 223. As a result of the amendment, voters and organizations "will be less willing to engage in protected political expression on these types of issues in the future," which plaintiffs claim is a denial of access to the ballot. *Id.* at ¶ 226.

The only ostensible overlap is between the *Scheiner's* right to vote claim and the plaintiffs' first cause of action. By its reference to the redistricting cases, the *Scheiner* claim implicates the right for citizens to vote on matters that affect the structure of their government. The plaintiffs in this case do not assert such a right, but instead assert a right to a 'meaningful vote,' regardless of the issue in question. If the law had not concerned term-limits, but rather some other issue unrelated to government, the *Scheiner* claim would no longer apply, whereas the plaintiffs' claim would remain. The fact that both parties make claims regarding voting does not make the claims the same. A court could in theory find that there is no fundamental right to vote on the structure of government, while

also finding that there is a fundamental right to a meaningful vote.

Defendants group all of these claims together as "Constitution-based challenges" to the term limits amendment. Defendants' Opposition to P. Mem. at 1 ("D. Opp."). This grouping is overbroad. The fact that both complaints contain Constitutional challenges to the term-limits amendment does not make the cases related. The claims in the two actions do not overlap. The cases are not strictly 'related' as defined by the applicable law. However, that does not end the inquiry. Other considerations must be taken into account.

## C. The Interests of Justice and Judicial Economy

The parties have made several arguments pertaining to judicial economy and the interests of justice.

### 1. The Pending Motion to Dismiss

Plaintiffs argue that the pending motion to dismiss in the *Scheiner* action nullifies any justice efficiency argument. If the motion is successful, there would be no purpose in transferring this case to the Southern District. This argument is speculative at best. This Court is not in a position to determine the likelihood of success of the defendants' motion to dismiss in the *Scheiner* action.

## 2. Different Timing Concerns in the Two Actions

Plaintiffs have impressed upon the Court that they seek to resolve this case in a speedy fashion. Unlike in the *Scheiner* action, plaintiffs do not simply wish to invalidate the term-limits amendment, but rather seek to ensure that the issue is determined by referendum. Plaintiffs cite *Westchester Advocates for Disabled Adults v. Pataki*, in which the court held that where "speed of disposition is important," transfer is not warranted. 931 F.Supp. 993, 1005 (E.D.N.Y. 1996), *vacated on other grounds*, 113 F.3d 993. Were this case to be transferred to the Southern District, there could be a delay in resolving the issues presented, potentially eliminating the possibility of conducting a referendum on the issue.[11] Although Judge Stein will no doubt make every effort to expedite the resolution of both cases, some loss of time is inevitable. This factor weighs somewhat against transferring the action.

## 3. The Danger of Inconsistent Results

Defendants have argued that there is a danger of reaching inconsistent legal conclusions regarding the constitutionality of the law in the two cases. This fear is unwarranted. The *Scheiner* complaint is brief. It does not mention the First Amendment, and

---

[11]Particularly because of the likelihood that the *Scheiner* plaintiffs will need to obtain new counsel to represent them.

refers to Due Process rights only in the context of alleged discriminatory treatment of schoolteachers, which is unrelated to plaintiffs' entrenchment claim. It does refer to the right to vote, making reference to the one-person one-vote redistricting cases, which were decided under the Equal Protection clause of the Fourteenth Amendment. This claim is not related to the voting rights claims made by plaintiffs, which include right to a meaningful vote, right to political expression, and right to ballot access, all brought under the First Amendment. The success or failure of the constitutional claims in the *Scheiner* case does not have bearing on the constitutional claims in this case. Nevertheless, were Judge Stein to make a ruling regarding the constitutionality of the defendants' actions that had bearing on the case before me, that precedent would be treated as persuasive.

*4. Analysis*

The interests of justice and judicial economy do not favor transferring this motion to the Southern District. Due to the disparate nature of the constitutional claims, and the fact that the plaintiffs' complaint contains numerous claims not raised by the *Scheiner* complaint, there would be no significant saving in

judicial resources were I to transfer this case.[12] The plaintiffs in the two actions are completely distinct, and they represent different interests. The fact that the cases share the same core defendants does not weigh in favor of transfer, given that the core defendants are public figures. Both forums are equally convenient for the resolution of this action. Defendants have not met their heavy burden of overcoming the "great weight" accorded to plaintiffs' choice of forum. *D.H. Blair*, 462 F.3d at 107. Furthermore, the plaintiffs have an interest in the swift resolution of this matter, which weighs against transferring the case.

## CONCLUSION

For the reasons stated herein, the defendants' motion to transfer venue is denied. The Clerk is directed to transmit a copy of the within to all parties and to the assigned Magistrate Judge.

SO ORDERED.

Dated :     Brooklyn, New York
            December 22, 2008

                          s/Hon. Charles P. Sifton
       By: _____
                    United States District Judge

---

[12]It is certainly true that both cases will require some general familiarity with the relationship between referenda and legislative actions. However, this knowledge is no more specialized than that required for any other issue that could arise in multiple courts at once.