UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------X

Guy Molinari, William C. Thompson, Jr.,
individually and in his official capacity
as the New York City Comptroller, Betsy
Gotbaum, individually and in her official
capacity as Public Advocate for the City
of New York, Bill de Blasio, individually
and in his official capacity as a member
of the New York City Council, Letitia
James, individually and in her official
capacity as a member of the New York City
Council, Charles Barron, individually and
in his capacity as a member of the New
York City Council, Rosalie Caliendo,
Phillip Depaolo, Philip Foglia, Kent
Lebsock, Mike Long, Tom Long, Sarah Lyons,
Andrea Rich, Ida Sanoff, Gloria Smith,
Eric Snyder, Luvenia Suber, Kenneth J.
Baer, Kenneth A. Diamondstone, Peter
Gleason, Mark Winston Griffith, Ari
Hoffnung, Stanley Kalathara, Alfonso
Quiroz, Ydanis Rodriguez, Jo Anne Simon,
New York Public Interest Research Group,
Inc., U.S. Term Limits, and Responsible
New York,

                  Plaintiffs,          CV-08-4539 (CPS)(JO)

   - against -

                                  MEMORANDUM
                                  AND ORDER

Michael R. Bloomberg, in his official
capacity as Mayor of New York City,
Christine C. Quinn, in her official
capacity as Speaker of the New York City
Council, The New York City Council, The
City of New York, James J. Sampel, in his
official capacity as president of the
Commissioners of Elections for the Board
of Elections in New York City, and Board
of Elections of New York City,

                  Defendants.

----------------------------------------X
SIFTON, Senior Judge.

Plaintiffs Guy Molinari, the New York City Comptroller,

various members of the New York City Council who voted against

Local Law 51, the Public Advocate, voters, prospective

candidates, and good-government groups ("plaintiffs") commenced

this action against Michael Bloomberg ("Mayor Bloomberg"),

Christine Quinn ("Speaker Quinn"), the City of New York, and

other municipal entities ("defendants"),[1] alleging violations of

the First Amendment of the United States Constitution, the

Fourteenth Amendment, the New York State Constitution, the

Municipal Home Rule Law, and the New York City Charter.[2]

Plaintiffs seek a declaratory judgment that Local Law 51,

amending the New York City Charter provisions limiting the

eligibility of the Mayor, members of the City Council, and other

---

[1] For a detailed list of plaintiffs and defendants and their affiliations, see a prior opinion in this case at *Molinari v. Bloomberg*, 2008 U.S. Dist. LEXIS 101193, at *3-*7 (2008).

[2] The claims are as follows: (1) deprivation of First Amendment rights to a meaningful vote in violation of 42 U.S.C. § 1983 ("§ 1983") (Claim I); (2) chilling of First Amendment rights to political expression in violation of § 1983 (Claim II); (3) denial of First Amendment rights to access to the ballot in violation of § 1983 (Claim III); (4) denial of Fourteenth Amendment rights to Due Process in violation of § 1983 (Claim IV); (5) disenfranchisement of voters in violation of Article I, § 1 of the New York State Constitution (Claim V); (6) violation of the requirement of Municipal Home Rule Law § 23(2) that voters approve fundamental changes to the City Council by referendum (Claim VI); (7) violation of the requirement of City Charter § 38 that voters approve fundamental changes to their electoral and governmental structure (Claim VII); (8) actions in excess of the powers of the City Council under Municipal Home Rule Law §§ 10, 23 and City Charter §§ 23, 38, and 40 (Claim VIII); (9) violating the public policy of New York expressed in City Charter §§ 38, 1137, 1138 (Claim IX); (10) conflicts of interest on the part of Council Members in violation of City Charter § 2604(b)(3) (Claim X); (11) conflicts of interest on the part of Mayor Bloomberg in violation of City Charter § 2604(b)(3) (Claim XI); and (12) knowingly aiding and abetting the Mayor's violations of City Charter § 2604(b)(3) in violation of City Charter § 2604(b)(2) and Conflicts Board Rule 1-13(d)(Claim XII).

elected officials to run for office, is unconstitutional and in violation of Municipal Law and the City Charter and an injunction barring the Board of Elections from listing City officials who have served two consecutive terms in office on the ballot in the 2009 City elections. Now before the Court are defendants' motion to dismiss this action pursuant to Federal Rule of Civil Procedure 12(b)(6) or, in the alternative, for summary judgment pursuant to Federal Rule of Civil Procedure 56, and plaintiffs' motion for summary judgment pursuant to the same rule. For the reasons stated below, defendants' motion for summary judgment is granted, and plaintiffs' motion is denied.

## BACKGROUND

The following facts are drawn from the parties' submissions in connection with this motion. Disputes are noted.

In a 1993 city-wide referendum, New York City voters adopted an amendment to the City Charter instituting a two-term limit for city officials by a vote of 59% in favor versus 41% against, with over one million votes cast. Plaintiffs' Statement of Material Facts at ¶ 4 ("SMF"); Swain Decl. at ¶ 4(a). The City Charter was accordingly amended to state that it was the public policy of the City of New York to limit the eligibility to run for office of the Mayor, public advocate, comptroller, borough presidents or council members to persons who had not served to or more

consecutive terms in the office they sought to fill.[3] In 1996, City Council members presented a proposal to City voters in a referendum seeking to extend term limits from two terms to three terms, which voters rejected by a margin of 54% against versus 46% in favor. SMF at ¶¶ 5, 7; Swain Decl. at ¶ 4(b).

At an October 2, 2008 press conference, Mayor Bloomberg announced his plan to support a City Council legislative proposal to alter term limits and to run for reelection, citing the impending economic crisis as the justification. Ex. 28, Press Release, *Mayor Bloomberg Addresses New Yorkers About Term Limits*, Office of the Mayor, October 2, 2008. The media reported extensive opposition by good-government groups, media columnists, and government officials to the change in the law.[4]

Local Law 51 (the "term-limits amendment"), amending New

---

[3]As enacted pursuant to the 1993 Referendum, the City Charter's term-limits provisions provided, in pertinent part:

> § 1137. Public Policy. It is hereby declared to be the public policy of the City of New York to limit to not more than eight consecutive years the time elected officials can serve as mayor, public advocate, comptroller, borough president and council member so that elected representatives are "citizen representatives" who are responsive to the needs of the people and are not career politicians.

> § 1138. Term Limits. Notwithstanding any provision to the contrary contained in this charter, no person shall be eligible to be elected or to serve in the office of mayor, public advocate, comptroller, borough president or council member if that person has previously held such office for two or more consecutive terms (including in the case of council member at least one four-year term), unless one full term or more has elapsed since that person last held such office...

[4]*See*, *e.g.*, Ex. 32, Keith B. Richburg, *Bloomberg Is Said to Seek Reelection Despite Term Limit*, Wash. Post., October 1, 2008, at A2; Ex. 36, Michael Barbaro, *Big Change at Hand, Political Pugilists Are Unusually Calm*, N.Y. Times, October 4, 2008, at B1; Ex. 37, David Chen, *Clinton: Path is 'Disturbing'*, N.Y. Times, October 16, 2008, at A 36.

York City Charter §§ 1137-38 to extend the number of terms an official could serve consecutively from two to three terms, was introduced on October 7, 2008, "by request of the mayor." SMF at ¶ 10; N.Y. City Council Introduction 845 of 2008.

On October 9, 2008, plaintiff Council members de Blasio, James, and Gotbaum submitted a request for an advisory opinion to the Conflicts of Interest Board of the City of New York (the "Board"), seeking an opinion on whether the City Charter's conflicts-of-interest provisions would bar term-limited City officials from enacting the term-limits amendment. *See* Oct. 9. 2008 Letter to Conflicts Board. On October 15, 2008, the Conflicts Board issued its opinion concluding that no violation of the conflicts laws existed or would occur. *See* Conflicts of Interest Board, Advisory Opinion No. 2008-3 ("COIB Op."). On October 22, 2008, Council members de Blasio and James commenced a special proceeding against the Board and the City Council, pursuant to N.Y. C.P.L.R. Article 78, in the Supreme Court of New York County.[5] They sought judicial review of the Board's Advisory Opinion and provisional emergency injunctive relief to postpone a Council vote on the term-limits amendment. *See* Ex. 55, Transcript of October 22, 2008 hearing. Chief Justice Silbermann of the New York Supreme Court denied the application for a temporary restraining order and declined to sign the proposed order to show

---

[5] *de Blasio et al. v. Conflicts of Interest Bd.*, Index No. 114189/08 (Sup. Ct. N.Y. County) (Silbermann, J.).

cause, finding that the matter was not then justiciable. *See id.*

As the term-limits amendment was being prepared, plaintiffs de Blasio and James, along with Council member David Weprin, sponsored Introduction 858 of 2008, which would establish a Charter revision commission[6] to put the issue of term limits before New York voters in a referendum by special election in early 2009. *See* de Blasio Aff. at ¶ 7; James Aff. at ¶ 12. This resolution is still pending in the Council. *See* de Blasio Aff. at ¶ 7.

On October 23, 2008, the City Council voted 28 to 22, with one abstention, against a resolution to put the matter of term limits to a vote by public referendum. Ex. 57, Sewell Chan and Jonathan Hicks, *Council Votes, 29 to 22, to Extend Term Limits*, New York Times, October 23, 2008. The Council then voted 29 to 22 in favor of the term-limits amendment.[7] Ex. 58, Transcript of New

---

[6]Under New York law, the City Council may vote to establish a Charter revision commission that develops and recommends alterations to the City Charter, which thereafter must be submitted to voters in a referendum. Mun. H.R.L. § 36.

[7]As amended by the Bill, the term limits provisions in the New York City Charter state, in pertinent part:

§ 1137. It is hereby declared to be the public policy of the city of New York to limit the time elected officials can serve as mayor, public advocate, comptroller, borough president and council member so that elected representatives are "citizen representatives" who are responsive to the needs of the people and are not career politicians. It is further declared that this policy is most appropriately served by limiting the time such officials can serve to not more than three full consecutive terms.

§ 1138. [N]o person shall be eligible to be elected to or serve in the office of mayor, public advocate, comptroller, borough president or council member if that person has previously held such office for three or more full consecutive terms, unless one full term or more has elapsed

York City Council Meeting, October 23, 2008, at 92-129. ("Council Transcript"). Of the 35 Council members who would have been barred from seeking election in 2009 under the prior law, 23 voted in favor of the amendment. *See* Swain Decl. at ¶ 3; Council Transcript at 92-129. At the public bill-signing ceremony, Mayor Bloomberg stated his intention to convene a Charter revision commission in 2010 to put the term-limits issue on the ballot. Ex. 59, Transcript of Bill Signing, November 3, 2008.

In the City Council, seniority tends to confer greater powers and responsibilities, including appointment to Committee chairmanships and other leadership positions. *See* de Blasio Aff. at ¶ 3; James Aff. at ¶¶ 3-7; Stern Aff. at ¶ 11. Were it not for the term-limits amendment, the Speakership and certain Committee chairmanship positions would have been vacant following the 2009 election, creating opportunities for current junior senators to rise to positions of authority. *See* James Aff. at ¶¶ 5-7; Stern Aff. at ¶ 11; Siegel Aff. at ¶ 6. Over the past ten years, more than 98% of Council incumbents have been reelected, Swain Decl. at ¶ 2(b)-(d). If incumbents are again elected in the 2009 election, junior Council members will not have the same access to positions of authority in the Council. The parties do not agree on the degree to which seniority is a factor in making leadership and chairmanship assignments, but for the reasons stated below,

---

since that person last held such office...

the dispute is not material.


## DISCUSSION

### I. Summary Judgment Standard

A court must grant a motion for summary judgment if the movant shows that "there is no genuine issue as to any material fact" and that "the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment is appropriate "[w]hen the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587; 106 S. Ct. 1348; 89 L. Ed. 2d 538 (1986).

The party seeking summary judgment has the burden of demonstrating that no genuine issue of material fact exists. *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 252 (2d Cir. 1987). In order to defeat such a motion, the non-moving party must raise a genuine issue of material fact. "An issue of fact is genuine if the evidence is such that a reasonable jury [or other fact finder] could return a verdict for the nonmoving party." *Elec. Inspectors, Inc. v. Vill. of E. Hills*, 320 F.3d 110, 117 (2d Cir. 2003). A fact is material when it "might affect the outcome of the suit under the governing law." *Id.* Although all facts and inferences therefrom are to be construed in the light most favorable to the non-moving party, the non-moving party must

raise more than a "metaphysical doubt" as to the material facts. *See Matsushita*, 475 U.S. at 586; *Harlen Assocs. v. Vill. of Mineola*, 273 F.3d 494, 498 (2d Cir. 2001). The non-moving party may not rely on conclusory allegations or unsubstantiated speculation. *Twin Labs., Inc. v. Weider Health & Fitness*, 900 F.2d 566, 568 (2d Cir. 1990). Rather, the non-moving party must produce more than a scintilla of admissible evidence that supports its pleadings or its defense. *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289-90; 88 S. Ct. 1575; 20 L. Ed. 2d 569 (1968); *Niagara Mohawk Power Corp. v. Jones Chem. Inc.*, 315 F.3d 171, 175 (2d Cir. 2003). In deciding such a motion, the trial court must determine whether, "after resolving all ambiguities and drawing all inferences in favor of the non-moving party, a rational juror could find in favor of that party." *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000).

## II. Relevant Provisions of Federal Constitutional Law

The Supremacy Clause of the United States Constitution states that the "Constitution and the Laws of the United States... shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. Art. VI, cl. 2. "Federal preemption of a state statute can

be express or implied, and... occurs ... where federal law conflicts with state law." *SPGGC, LLC v. Blumenthal*, 505 F.3d 183, 188 (2d Cir. 2007) (internal quotation marks omitted).

"The... Fourteenth Amendment [makes] it unlawful for a State to abridge by its statutes the freedom of speech which the First Amendment safeguards...." *Palko v. Connecticut*, 302 U.S. 319, 324-25; 58 S. Ct. 149; 82 L. Ed. 288 (1937).

The First Amendment of the United States Constitution provides that Congress "shall make no law... abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. Amend. I. First Amendment rights are "among the most fundamental personal rights and liberties which are secured to all persons by the Fourteenth Amendment against abridgment by the States." *Thornhill v. Alabama*, 310 U.S. 88, 95; 84 L. Ed. 1093; 60 S. Ct. 736 (1940) (footnote omitted).

The Due Process Clause of the Fourteenth Amendment provides that "no State shall... deprive any person of life, liberty, or property, without due process of law." U.S. Const. Amend. XIV, § 1.

## III. Relevant Portions of New York State Law

Section 2(c) of Article IX of the New York State

Constitution sets forth the framework of municipal home rule in New York. That section authorizes cities and other local governments to adopt local laws relating to their "property, affairs or government" so long as such laws are "not inconsistent with the provisions of this constitution or any general law." In the case of cities, "general laws" are those that apply to all of the State's cities. *See* N.Y. Const. Art. IX, § 3(d)(1); N.Y. C.L.S. Municipal Home Rule Law § 2(5) ("Mun. H.R.L."). The State Constitution further authorizes local laws concerning the "powers, duties, qualifications... [and] terms of office... of [a municipality's] officers and employees," subject to restriction by the State Legislature. These powers are implemented and repeated in § 10 of the New York Municipal Home Rule Law. Municipalities thus have flexibility in structuring their governance, except where in conflict with the State Constitution and general laws of the State. *See Jancyn Mfg. Corp. v. County of Suffolk*, 71 N.Y.2d 91, 518 N.E.2d 903; 524 N.Y.S.2d 8 (1987).

If a local law concerns certain matters specified in Home Rule Law § 23 or Charter § 38, the law must be the subject of a referendum. The Municipal Home Rule law provides, in pertinent part, that a law must be submitted to the voters if it:

    a. provides a new charter for the city;
    b. changes the membership or composition of the legislative body;
    c. changes the term of an elective office; or
    d. abolishes, transfers or curtails any power of an elective officer.

N.Y. Mun. H.R.L. § 23(2). The Charter provides, in pertinent part, that a law must be submitted to the voters if it:

   a. abolishes or changes the form or composition of the council;
   b. changes the term of an elective officer; or
   c. abolishes, transfers or curtails any power of an elective officer.

Charter § 38.

Aside from the short lists of changes cited above that require a mandatory referendum, neither the Municipal Home Rule Law nor the City Charter place any limitations on the legislature's ability to overturn or modify laws passed by referendum, or vice versa. As a result, each subsequent enactment takes priority over previous ones, regardless of the source. The New York Court of Appeals has endorsed the statement that "laws proposed and enacted by the people under an initiative provision are subject to the same constitutional, statutory, and charter limitations and those passed by the legislature and are entitled to no greater sanctity or dignity." *Matter of Caruso v. City of New York*, 136 Misc. 2d 892, 895-96; 517 N.Y.S.2d 897 (1987), *aff'd*, 143 A.D.2d 601 (1st Dept.), *aff'd for reasons stated by trial court*, 74 N.Y.2d 854 (1988). New York courts have on a number of occasions upheld legislative amendments to laws that were originally enacted by referendum. In *Benzow v. Cooley*, 12 A.D.2d 162; 209 N.Y.S.2d 364 (4th Dept. 1961), *aff'd*, 9 N.Y.2d 888; 175 N.E.2d 830; 216 N.Y.S.2d 701 (1961), the court upheld the legislative addition of civilian members to the civilian

complaint review board, whose membership had been limited to police officers by a prior referendum. In *Golden v. New York City Council*, 305 A.D.2d 598; 762 N.Y.S.2d 410 (2d Dept. 2003), the Appellate Division upheld an amendment to the 1993 term-limits law permitting Council members with unusually short terms to serve an additional two years.[8] In addition, four local laws enacted since 1991 have amended Charter provisions originally enacted by referendum.[9]

The Municipal Home Rule Law and certain provisions in the New York City Charter specify the procedures and restrictions that govern the passage of local legislation. The City Council has the power to adopt local laws, subject to mayoral approval or veto, which may be overridden by a two-thirds vote of the City Council. N.Y. Mun. H.R.L. §§ 20-21; N.Y.C. Charter §§ 34-37 ("Charter"). The Mayor, the City Council, or a voter petition may create a Charter revision commission, which may propose amendments to the City Charter that are subject to approval by referendum. N.Y. Mun. H.R.L. § 36. Additionally, a local law amending the City Charter "however extensively" or providing a new City Charter may be initiated by petition and may be passed

---

[8] These cases are described in more detail in the discussion on plaintiffs' State law claims, *infra*.

[9] Local Law 61 of 1991 (amending 1989 referendum-enacted Charter provision consolidating offices); Local Law 18 of 1994 (amending 1989 referendum-enacted Charter provision on competitively sealed bids); Local Law 60 of 2004 and Local Law 34 of 2007 (amending 1988 Charter revision commission rule on campaign finance).

either by the legislature or by referendum. N.Y. Mun. H.R.L. §
37. New York City's term-limits law was first adopted by the
voters through the latter process in 1993, after the New York
Court of Appeals affirmed that the law was within the City's
local home rule powers. *See Matter of Roth v. Cuevas*, 82 N.Y.2d
791; 624 N.E.2d 689; 604 N.Y.S.2d 551 (1993).

The referendum process in New York City is governed by
Municipal Home Rule Law § 37(2), which requires that a referendum
proponent gather a number of signatures equaling at least 10% of
the total votes cast in the last gubernatorial election, or
thirty thousand, whichever is less. Only signatures of qualified
electors who were registered to vote in the preceding election
may be counted towards the petition. *Id.* Once a petition is filed
with the City Clerk, it is passed to the City Council for
consideration. Mun. H.R.L. § 37(6). If the Council does not adopt
the provision within two months of filing, advocates must file an
additional petition within two months, which ensures the
submission of the question to a public vote. Mun. H.R.L. § 37(7).
The additional petition must be signed by half the number
required for the initial petition, and signatures on the
additional petition may not replicate any of the signatures on
the initial petition. *Id*.


**IV. The Claims**

Plaintiffs assert claims under the Federal Constitution, the New York State Constitution, New York State law, and New York City law. The claims under Federal law are brought pursuant to 42 U.S.C. § 1983. "It is well established that in order to state a claim under § 1983, a plaintiff must allege (1) that the challenged conduct was attributable at least in part to a person acting under color of state law, and (2) that such conduct deprived the plaintiff of a right, privilege or immunity secured by the Constitution or laws of the United States." *Eagleston v. Guido*, 41 F.3d 865, 875-76 (2d Cir. 1994) (quoting *Dwares v. City of New York*, 985 F.2d 94, 98 (2d Cir. 1993)). Generally, § 1983 "allows plaintiffs with federal or constitutional claims to sue in federal court without first exhausting state judicial or administrative remedies." *Hellenic Am. Neighborhood Action Comm. v. City of New York*, 101 F.3d 877, 881 (2d Cir. 1996) (citations omitted). Plaintiffs allege that the defendant City officials' actions in passing and seeking to enforce Local Law 51 deprived them of rights under the First and Fourteenth Amendments.

**A. First Amendment**

Reflecting the diversity of their group, including voters, members of the minority in the City Council vote on Local Law 51, prospective challengers to incumbents seeking public office, present holders of elective office seeking seniority and good government groups, among others, plaintiffs rely on several

different lines of cases from the Supreme Court of the United States and Courts of Appeal of this (the Second) and other circuits analyzing the several rights protected by the First Amendment. Plaintiffs argue on behalf of past and future voters on referenda in Claim I of their complaint that Local Law 51 has denied them their rights to vote effectively and meaningfully, a right recognized by *Williams v. Rhodes*, 393 U.S. 23, 30; 89 S. Ct. 5; 21 L. Ed. 2d 24 (1968), by 'nullifying' the results of the 1993 and 1996 referenda, which established the two-terms limit, and by discouraging voters from voting for similar referenda in the future.

Plaintiffs argue in Claim III on behalf of past and future supporters of referenda and prospective candidates for elective office and their supporters that Local Law 51 denies supporters of referenda access to the ballot, a right recognized as among the several protected in the First Amendment in *Buckley v. Am. Constitutional Law Found.*, 525 U.S. 182; 119 S. Ct. 636; 142 L. Ed. 2d 599 (1999) and *Meyer v. Grant*, 486 U.S. 414, 420; 100 L. Ed. 2d 425; 108 S. Ct. 1886 (1988), by demonstrating that the results of referenda are not shielded from legislative revision, thereby discouraging supporters from investing the time and resources necessary to place matters like term limits on the ballot and by discouraging challengers to incumbents for City office and their supporters from running for public office because of the incumbents' advantages in such a contest.

Plaintiffs argue further in Claim II on behalf of all their members that Local Law 51 limits their rights of free speech by "chilling" speech or making it less likely that candidates, their supporters, and proponents of future referenda will speak out in support of their cause, having been discouraged by the reversal of the decision of the 1994 and 1996 referenda. Plaintiffs refer to *Laird v. Tatum*, 408 U.S. 1, 12; 92 S. Ct. 2318; 33 L. Ed. 2d 154 (1972) and *Husain v. Springer*, 494 F.3d 108, 128 (2d Cir. 2007).

Finally, plaintiffs contend on behalf of all the diverse members of their group that whatever the impact of Local Law 51 on their right to vote, to ballot access, and/or to speak, that impact outweighs the City Council's actual as opposed to stated purpose in enacting the law, because that purpose was the illegitimate one of keeping incumbents in office. *See Landell v. Sorrell*, 382 F.3d 91, 128 (2d Cir. 2002) ("election laws, written by legislators who are, at least in part, necessarily self-interested, must be scrutinized for indications that [they] unduly benefit incumbents or otherwise create dangerous distortions of the electoral system."); *Landell v. Sorrel*, 406 F.3d 159, 176 (2d Cir. 2005) (Jacobs, J. dissenting from denial of rehearing) (where the "salient effect of the Act is to entrench incumbents," the "effect that is fatal."); *Randall v. Sorrell*, 548 U.S. 230, 249; 126 S. Ct. 2479; 165 L. Ed. 2d 482 (2006) (where challengers are prevented from "mounting effective

campaigns against incumbent officeholders," the electoral process
and democratic accountability are harmed); *Nixon v. Shrink*, 528
U.S. 377, 402; 120 S. Ct. 897; 145 L. Ed. 2d 886 (2000) (Breyer,
J. and Ginsburg, J., concurring) (although a legislature is
normally entitled to deference in regulating election processes,
this deference cannot apply to "constitutional evils" such as
"permitting incumbents to insulate themselves from effective
electoral challenge."). Plaintiffs state that the appropriate
standard of review is the 'flexible standard' balancing test
found in *Anderson v. Celebrezze*, 460 U.S. 780, 75 L. Ed. 2d 547,
103 S. Ct. 1564 (1983), and reiterated in *Burdick v. Takushi*, 504
U.S. 428; 112 S. Ct. 2059; 119 L. Ed. 2d 245 (1992).

I proceed to consider each of these claims below.

*1. Right to a Meaningful or Effective Vote*

Plaintiffs' claim that the passage of the term-limits
amendment rendered the votes in the 1993 and 1996 referenda
"ineffective" and "meaningless" must be rejected. While
plaintiffs rhetorically suggest that the City Council's enactment
of Local Law 51 was no different than if the Council had
destroyed the ballots cast in the 1993 and 1996 referenda before
they were counted, or if the Council had stuffed the ballot box
to keep themselves in power, *see* Pl.'s Memo. at 33, the analogy
is spurious. The Charter Amendment voted on in the 1993 and 1996
referenda has been on the books for a number of election

cycles.[10] It has had its effect and the referenda were not without meaning.[11] The principle of ensuring effective voting does not protect the outcome of a referendum vote from being changed by the outcome of a legislative vote. "Although the First Amendment protects political speech incident to an initiative campaign, it does not protect the right to make law, by initiative or otherwise." *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1099 (10th Cir. 2000). Laws that determine the structural relationship of enacted legislation to other laws do not affect First Amendment rights. *See Marijuana Policy Project v. United States*, 304 F.3d 82, 85 (D.C. Cir. 2002) (finding no authority for the suggestion that "limits on legislative authority – as opposed to limits on legislative advocacy – violate the First Amendment."). To hold that overturning a law enacted by referendum infringed on First Amendment rights would effectively bar repeal, amendment, or revision of all laws initiated by the people.

In support of their position, plaintiffs cite *Williams v. Rhodes*, 393 U.S. 23; 89 S. Ct. 5; 21 L. Ed. 2d 24 (1968), a case decided on equal protection grounds, in which the Supreme Court invalidated an Ohio requirement that third parties seeking to place the names of candidates not from the Republican or

---

[10]The amendment went into effect in 2001.

[11]*See Caruso*, 136 Misc. 2d at 900.

Democratic parties on the ballot submit petitions signed by a very substantial number of qualified electors. *Id.* at 24-25. The Supreme Court held that this provision unconstitutionally impaired the right to vote, because Ohio had given "two old, established parties a decided advantage over any new parties struggling for existence," *id*. at 31, thereby denying voters the right to "cast their votes effectively." *Id.* at 30. Nothing in *Williams* suggests that the constitutional interest in ensuring placement on the ballot for minority parties extends to enshrining the outcome of past referendum votes or protecting all challengers in a contest with any incumbent. Furthermore, no showing has been made here that "the incumbents" operate as a party akin to the established parties in *Williams*, and, indeed, the split vote in the Council suggests the contrary. While incumbency no doubt offers certain advantages to individual incumbents, including media exposure and increased fundraising abilities, a record of blunders or, more pointedly in the present circumstances, a record of failure to anticipate and deal with an economic crisis may favor the challengers over the incumbent. A law that permits both incumbent and challenger access to the ballot cannot plausibly be said to deny access to the challengers in favor of the incumbents.

In further support of their position, plaintiffs cite *Reynolds v. Simms*, 377 U.S. 533, 555, 84 S. Ct. 1362; 12 L. Ed. 2d 506 (1964), an equal protection case, in which the Supreme

Court articulated the "one person, one vote" standard for redistricting. *Id*. at 558. The Court stated that "the right of suffrage can be denied by a debasement or a dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Id*. at 555. Nothing in *Reynolds* supports the notion that a vote may be 'debased' or 'diluted' by a later vote that produces a different outcome.

## 2. Expression Claims

Limitations on the core First Amendment right of political expression are subject to "exacting scrutiny." *Buckley v. Valeo*, 424 U.S. 1, 44-45; 96 S. Ct. 612; 46 L. Ed. 2d 659 (1976). Petition circulation constitutes "core political speech," because it involves "interactive communication concerning political change."[12]*Meyer v. Grant*, 486 U.S. 414, 422 (1988); *accord Buckley v. Am. Constitutional Law Found*., 525 U.S. 182 (1999) ("*Buckley*"). In addition, governmental action that falls short of a direct limitation on speech may give rise to a constitutional violation if it deters or "chills" speech. *See Laird v. Tatum*, 408 U.S. 1, 12; 92 S. Ct. 2318; 33 L. Ed. 2d 154 (1972); *Husain v. Springer*, 494 F.3d 108, 128 (2d Cir. 2007). In order to show a

---

[12]Although the powers of initiative and referendum are State-created rights, the State is not free to impose limitations on the free exercise of that right. *See Meyer*, 486 U.S. at 424-25.

cognizable constitutional injury pertaining to the chilling of speech, a plaintiff must allege government action that has "an actual, non-speculative chilling effect," showing that speech is actually affected. *Colombo v. O'Connell*, 310 F.3d 115, 117 (2d Cir. 2002).

In this case, the term-limits amendment does not directly limit core political speech (nothing in the text of the amendment concerns speech), nor does the amendment regulate the petition process in a manner that has the effect of limiting speech. Instead, plaintiffs allege that the ability of the City Council to undo the results of a referendum discourages political speech in the form of referenda.

*a. Chilling Speech*

In *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1099 (10th Cir. 2000), the Tenth Circuit Court of Appeals recognized that plaintiffs in a suit challenging an amendment to the Utah constitution that required a two-thirds majority of voters to pass an initiative concerning wildlife could establish a cognizable constitutional injury by submitting "(1) evidence that in the past they have engaged in the type of speech affected by the challenged government action; (2) affidavits or testimony stating a present desire, though no specific plans, to engage in such speech; and (3) a plausible claim that they presently have no intention to do so because of a credible threat that the

statute will be enforced." *Walker*, 450 F.3d at 1089. The Court found that the third prong was satisfied when plaintiffs alleged that the supermajority requirement was the reason they had no plans to bring a wildlife initiative, because such an attempt would be futile. *Id*. at 1092. Nevertheless, the Court found that there was no chilling of speech, because the law had simply reduced speech by making it less likely to succeed. *Id*. at 1099-1101.

Here, plaintiffs have submitted affidavits showing that some of them engaged in speech pertaining to the 1993 and 1996 term-limits referenda. *See* Rich Decl. at ¶ 5; Long Aff. at ¶ 2. Plaintiffs have also submitted affidavits stating that they presently seek to submit the term-limits issue to voters in a referendum. *See* De Blasio Aff. at ¶ 7; James Aff. at ¶ 12. Plaintiffs have in addition submitted affidavits stating that, despite their efforts so far, they have no intention of continuing to engage in the expensive and time-consuming referendum process, because such an action would be futile if the City Council can simply reverse the outcome by passing a local law. *See* Lebsock Aff. at ¶¶ 4-6. In short, plaintiffs have offered evidence that the term-limits amendment has the plausible effect of causing them to refrain from speaking. Nevertheless, plaintiffs have failed to establish a constitutional violation. The First Amendment is not implicated by every reduction on speech. "[T]here is a crucial difference between a law that has

the 'inevitable effect' of reducing speech because it restricts or regulates speech, and a law that has the 'inevitable effect' of reducing speech because it makes particular speech less likely to succeed." *Walker*, 450 F.3d at 1100. "The First Amendment ensures that all points of view may be heard; it does not ensure that all points of view are equally likely to prevail." *Id.* at 1101.

In 1993 and again in 1996, the proponents of referenda successfully advocated before the public the position that in the circumstances as they then existed, elected officials should hold office for no more than two consecutive terms. Some plaintiffs now plausibly state that they either continue to maintain their earlier positions or agree with that position even in the current economic situation.[13] Their position may well have merit and it may again prevail either in the context of a new referendum or in an election in which all or many incumbents are rejected at the polls. However, as noted in *Walker*, *supra*, the right of free speech does not protect the content of one side's speech from having to address the content of the speech of an opponent. Again, "[t]he First Amendment ensures that all points of view may be heard; it does not ensure that all points of view are equally likely to prevail." *Id*. at 1101.

Plaintiffs cite *Husain v. Springer*, 494 F.3d 108 (2d Cir.

---

[13]Other plaintiffs are against term limits, or believe that an extension of term limits is warranted in the current circumstances.

2007) for the proposition that "nullification of [an] election" can chill speech if it creates a disincentive for speech expressing "similar content in the future." 494 F.3d at 128. In *Husain*, a college president nullified a student election because of the college newspapers's allegedly inappropriate endorsement of a slate of student candidates. The Second Circuit held that the president's actions had created an unconstitutional chill, because the retaliatory action would "force the newspaper to refrain from publishing that or similar content in the future," and noted that the paper had already scaled back its political commentary. *Id*. In this case, the City Council amended a law, not because the law had been passed by a referendum, which might arguably have been called 'retaliation' comparable to the actions of the University President in *Husain*, but instead for legitimate legislative purposes, as discussed below. In all events, passing a subsequent law that overturns a prior law is not a nullification of the results of prior laws. If it were, as noted above, no law could be repealed or amended. *See Walker*, 450 F.3d at 1100-01. Accordingly, I conclude that plaintiffs have failed to demonstrate that their First Amendment rights of free expression have been directly or indirectly curtailed by Local Law 51.

*b. Ballot Access*

The Supreme Court's line of ballot access cases concern

procedural restrictions placed on the petitioning process. *See*
*Meyer*, 486 U.S. 414 (finding unconstitutional a law making it a
felony to pay petition signature gatherers); *Buckley*, 525 U.S.
182 (striking down a law requiring that signature gatherers be
registered voters).[14] The *Meyer* Court stated that the challenged
law restricted political expression by making it less likely that
petitions would gain the number of signatures necessary to place
the measure on the ballot, "thus limiting their ability to make
the matter the focus of statewide discussion." *Id*. at 422-23.
Plaintiffs base their ballot-access claim on the argument that
the ability of the City Council to amend or repeal laws enacted
by referendum will make it less likely that future petitioners
and petition gatherers will succeed in placing matters of high
interest to Council members, such as term limits, on the ballot.

Local Law 51 establishes no procedural barriers to ballot
access. Indeed, it removes some. As a result of the local law,
incumbents and challengers can now face off in an election or in

---

[14]In *Meyer*, the Supreme Court held that petition circulation is "core
political speech," because it involves "interactive communication concerning
political change." 486 U.S. at 422. In that case, the Court struck down a
Colorado State law making it a felony to pay signature gatherers, on the
grounds that the law limited the number of voices conveying the message
advocated by the proponents of a petition, and would make it less likely that
petitions would garner the number of signatures necessary to place the measure
on the ballot, "thus limiting their ability to make the matter the focus of
statewide discussion." *Id*. at 422-23. In *Buckley*, the Supreme Court struck
down a different set of restrictions of signature gatherers in Colorado. In
that case, the Court found that the requirement that signature-gatherers be
themselves registered voters "cut[] down the number of carriers in the
ballot-access arena without impelling cause." 525 U.S. at 197. The Court
recognized that the States have "considerable leeway to protect the integrity
and reliability of the initiative process," but that it was the work of the
Court to "guard against undue hindrances to political conversations and the
exchange of ideas." *Id*. at 191-92.

a new referendum to argue before the public whether, for example, seniority is of greater value than change in the current economic climate. While the incumbents may be said to have the advantage of a record in public office (assuming the record is a good one), that record here includes votes for or against Local Law 51.

Plaintiffs cite in support of their ballot access claim a decision in this court by Judge Korman in *Molinari v. Powers*, 82 F.Supp.2d 57 (E.D.N.Y. 2001) (*Molinari I*).[15] *Molinari I*, unlike this case, involved the manipulation of procedures governing the placement of candidates on the ballot (in that case, the Republican presidential candidates).[16] Because the procedures served no legitimate state purpose and because the burden on ballot access outweighed the purposes asserted for the procedural road blocks,[17] Judge Korman struck down the State law to further ballot access for candidates not supported by the national Republican Party.

---

[15]Plaintiffs initially sought to relate the present case to this one under Local Rule 50.3, but abandoned that claim when challenged by Magistrate Judge James Orenstein in an Order to Show Cause.

[16]A presidential candidate was required to collect 5,000 signatures statewide, and each delegate pledged to support the candidate was required to obtain signatures from .5% of registered Republican voters in each district. 82 F.Supp.2d at 59. Because signatures were subject to legal challenges, it was necessary to amass a large budget in order to gather far more than the required number of signatures and to clear the legal hurdles to ballot access. *Id.* at 61.

[17]Judge Korman additionally found that two individual elements of the process for gaining access to the ballot were unconstitutional, namely, the requirement that signature gatherers be registered voters and that petition signers list their city of residence rather than their town. *Id.* Judge Korman struck down these two elements, finding that they had no rational basis and could not justify the burden imposed on First Amendment rights, which included impeding communication between signature gatherers and voters. *Id.* at 72-75.

*c. First Amendment Balancing*

In *Anderson v. Celebrezze*, 460 U.S. 780 (1983) and *Burdick v. Takushi*, 504 U.S. 428 (1992), the Supreme Court recognized that every election law "invariably impose[s] some burden on [the right to vote and right of association of] individual voters."[18] *Id.* at 433. Because imposing a rule prohibiting laws imposing such burdens unless absolutely necessary "would tie the hands of the states," *id.*, courts instead are to apply a flexible standard, under which a court must "'weigh' the burdens imposed on the plaintiff against 'the precise interests put forward by the State,' [taking] 'into consideration the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Price v. N.Y. State Bd. of Elections*, 540 F.3d 101, 108-09 (2d Cir. 2008) (quoting *Burdick*, 504 U.S. at 434).

Plaintiffs' claims also fail under the *Anderson/Burdick* test. The City has legitimate interests in Local Law 51 that justify the alleged creation of disincentives to the plaintiffs' political expression by vote, association, or otherwise. Defendants articulate the purpose of the term-limits amendment as providing "continuity of leadership during the current fiscal crisis," and providing "citizens of New York City

---

[18]Whether a law "governs the registration and qualifications of voters, the selection and eligibility of candidates, or the voting process itself, inevitably affects -- at least to some degree -- the individual's right to vote and his right to associate with others for political ends.'" *Burdick*, 504 U.S. at 433 (quoting *Anderson*, 460 U.S. at 788).

the option of choosing seasoned leadership during a period of extraordinary fiscal hardship at the federal, state, and local levels." Def. Memo. at 6, 25. The alleged deterrent effects on plaintiffs' ballot access, speech rights and voting rights are neither direct nor powerful enough to outweigh the City's interest in addressing a severe economic crisis by increasing the choices available to voters. Voters may consider the records of incumbents in dealing with the current situation, recognizing that the record will include the candidates' vote on Local Law 51.

Although plaintiffs seek to avoid confronting the reality, in current circumstances, of the articulated purpose of Local Law 51 or the logic of its means of serving that purpose, by seeking to equate this matter with *Williams*, in which the Supreme Court struck down a law whose stated purpose included the "stability" of government, 393 U.S. at 32, there can be little doubt that measures designed to deal with the impact on New York City of the global, national, and economic crisis are legitimate. Nor is it irrational to give voters the option of considering the experience and skills of current holders of public office as reflected by their records in office, along with the qualifications of challengers advocating change.

Incumbents have tools to employ in elections that are not available to challengers, including the fact that they can run on their records. But a record can just as easily be used against an

incumbent as it can be used to support him or her, as suggested by such common election slogans as "throw the rascals out" or "time for a change." The record of these particular incumbent defendants will moreover include their rejection of the electorate's determination in 1993 and again in 1996 that the elected officials should serve for no more than two (consecutive) terms. There is, in other words, nothing in the City Council's resolution which locks their challengers and their supporters out or deprives them of access to the ballot or the right to vote or limits their exercise of free speech, or prevents them from urging voters to examine the current economic situation, the incumbents' record in dealing with it, their reversal of the results of the term limits referenda, and to "throw the rascals out."

Nor are the claims of plaintiffs anywhere near as impressive as those reflected in the case law on which plaintiffs rely. Whatever the discouraging effect of the reversal of the outcome of the 1993 and 1996 referenda, it is hardly equivalent to the examples of disenfranchisement of voters or ballot stuffing referred to by plaintiffs. Nor is the effect of Local Law 51 on the candidacies of first-time aspirants for public office to deprive them of an opportunity to argue that new approaches by new people are better than the ways that have been tried to date by the incumbents ("who got us in this mess in the first place" to quote a common position urged in similar situations). Nor is

the argument that giving access to the ballot to others to compete with first-time candidates somehow lessens the ballot access of the challengers particularly weighty. Looking at the process of weighing the "legitimacy and strength," *Schulz v. Williams*, 44 F.3d 48, 58 (2d Cir. 1994) (quoting *Anderson*, 460 U.S. at 789), of both sides' interests, it becomes apparent that in addition to the legitimate legislative purpose rationally pursued by Local Law 51, there are, on the part of incumbents, interests in securing ballot access, affording the voters the right to decide, and the rights of self-expression embodied in the First Amendment. On balance, no rational fact finder could conclude that the claimed interference with plaintiffs' rights outweighs the right of the City Council to let the people choose the best candidates to deal with the current economic situation.

Accordingly, defendants are granted summary judgment on plaintiffs' First Amendment claims: Claims I, II, and III.

## C. Fourteenth Amendment (Claim IV)

Plaintiffs allege a violation of substantive due process.[19] "Substantive due process protects individuals against government action that is arbitrary, conscience-shocking, or oppressive in a constitutional sense, but not against government action that is

---

[19]Defendants construe plaintiffs' claim as a procedural due process claim, and argue that plaintiffs have not identified the protected liberty or property interest that is being deprived. However, plaintiffs make clear in their papers that their claim is grounded in substantive due process.

incorrect or ill-advised." *Lowrance v. Achtyl*, 20 F.3d 529, 537 (2d Cir. 1994) (internal citations omitted).

When a right is "fundamental," governmental regulation must be "narrowly tailored to serve a compelling state interest." *Reno v. Flores*, 507 U.S. 292, 302; 113 S. Ct. 1439; 123 L. Ed. 2d 1 (1993). Rights are fundamental in the substantive due process framework when they are "implicit in the concept of ordered liberty," *Palko v. Connecticut*, 302 U.S. 319, 325-26; 82 L. Ed. 288; 58 S. Ct. 149 (1937), or "deeply rooted in this Nation's history and tradition." *Moore v. East Cleveland*, 431 U.S. 494, 503; 52 L. Ed. 2d 531; 97 S. Ct. 1932 (1977). The right to vote is fundamental. *See Williams*, 393 U.S. at 31 ("No right is more precious in a free country than that of having a voice in the election of those who make the law under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined.") In the context of an election, violations of substantive due process have been found in the following situations: dilution of votes by reason of malapportioned voting districts, purposeful or systematic discrimination against voters of a certain class or political affiliation, refusing to hold an election as mandated by state or local law, not counting votes, and other willful conduct that undermines the "organic processes" by which candidates or positions are selected. *Shannon v. Jacobowitz*, 394 F.3d 90, 96 (2d Cir. 2005) (collecting cases); *Nolles v. State Comm. for the*

*Reorg. of Sch. Dists*., 524 F.3d 892, 898-99 (8th Cir. 2008)

(collecting cases).

"Legislative acts that do not interfere with fundamental rights or single out suspect classifications carry with them a strong presumption of constitutionality." *Beatie v. City of New York*, 123 F.3d 707, 711 (2d Cir. 1997). A court may "invalidate such a law on substantive due process grounds only when a plaintiff can demonstrate that there is no rational relationship between the legislation and a legitimate legislative purpose."[20] *Id*. "[W]hen reviewing challenged social legislation, a court must look for 'plausible reasons' for legislative action, whether or not such reasons underlay the legislature's action." *Id*. at 712 (citing *United States R.R. Retirement Bd. v. Fritz*, 449 U.S. 166, 179, 66 L. Ed. 2d 368, 101 S. Ct. 453 (1980)). "The due process clause 'is not a guarantee against incorrect or ill-advised government decisions.'" *Interport Pilots Agency v. Sammis*, 14 F.3d 133, 144 (2d Cir. 1994) (quoting *Bishop v. Wood*, 426 U.S. 341, 350; 48 L. Ed. 2d 684; 96 S. Ct. 2074 (1976)).

Plaintiffs allege that defendants violated substantive due

---

[20]The substantive due process standard differs according to whether the challenged governmental action is executive or legislative. *County of Sacramento v. Lewis*, 523 U.S. 833, 846; 118 S. Ct. 1708; 140 L. Ed. 2d 1043 (1998) ("While due process protection in the substantive sense limits what the government may do in both its legislative and its executive capacities, criteria to identify what is fatally arbitrary differ depending on whether it is legislation or a specific act of a governmental officer that is at issue." (citations omitted)). The actions of government officers are subject to the familiar "shock the conscience" standard. *See Pena v. DePrisco*, 432 F.3d 98, 112 (2d Cir. 2005). Legislative actions are assessed under the "rationally related" test, as stated in *Beatie*, 123 F.3d at 711.

process by failing to hold an election that was required under State law, and by passing an amendment whose purpose was to entrench legislators in office. These claims will be considered in turn.

## 1. Violation of State Law

If New York State law requires that there be a referendum on the subject of term limits, then the failure to hold such a referendum effects a "total and complete disenfranchisement of the electorate as a whole," which "is patently and fundamentally unfair."[21] *Bonas v. Town of N. Smithfield*, 265 F.3d 69, 75 (1st Cir. 2001). Hence, the substantive due process claim founded on election processes depends on the outcome of the State claims. Since I conclude, as discussed below, that State law does not require a referendum in order to alter term limits, there is no violation of substantive due process on this ground.

## 2. Legislative Entrenchment

A court may not invalidate a law on substantive due process grounds when there is a rational relationship between the

_____

[21]In *Bonas*, a municipal referendum moved local elections from odd years to even years, beginning in 2002. This change necessitated an irregular term, whereby officials elected in 2000 would face an election in 2001 after only one year in office, or would forgo the 2001 election and thereby serve three years in office. The local officials opted to forgo the 2001 election. The First Circuit held that the incumbent politicians' decision to extend their own terms violated Due Process, because the text of the law passed by referendum had made no indication that there would be any change in election practice before 2002; until that time, the odd-year elections were required. 265 F.3d at 77-78.

legislation and any plausible government purpose. *See Beatie*, 123 F.3d at 711. The purpose of extending the amount of time a legislator is eligible to serve in order to permit more experienced legislators to run for reelection is a legitimate one. It is not unreasonable to maintain that government will be more effective and efficient if legislators are permitted to serve for longer periods of time. Longer-serving legislators have greater experience in solving problems, greater familiarity with the procedures and logistics of government, and more developed relationships with other actors in government that permit them to serve their constituents efficiently. In addition, permitting incumbents to run for reelection places the choice of leadership in the hands of voters, who must examine the records of legislators and determine if their prior service merits another term. Facilitating democratic choice over leadership is undeniably a legitimate purpose in a democracy.

Critics of long-serving legislators may claim that they are in fact inefficient and ineffective. Similarly, an argument might be made that while increasing democratic choice is a legitimate purpose, the City Council in fact decreased democratic choice by declining to submit the question of term limits to a referendum. However, when fundamental rights are not at stake, a legislature is not required to choose the best possible way of effecting its stated purpose. "Substantive due process protects against government action that is arbitrary, conscience-shocking, or

oppressive in a constitutional sense, but not against government action that is 'incorrect or ill-advised.'" *Kaluczky v. City of White Plains*, 57 F.3d 202, 211 (2d Cir. 1995) (quoting *Lowrance*, 20 F.3d at 537); *see also Beatie*, 123 F.3d at 712.

To support their claim that the enactment of Local Law 51 violated substantive due process, plaintiffs cite cases addressing substantive due process claims in the election context. *See Bonas*, 265 F.3d 69; *Curry v. Baker*, 802 F.2d 1302 (11th Cir. 1986); *Marks v. Stinson*, 19 F.3d 873 (8th Cir. 2005). These cases state that election practices that systematically deny voting rights may rise to the level of fundamental unfairness by denying the right to vote, and apply only to the process of conducting (or failing to conduct) elections. Plaintiffs do not claim here that an election was corrupt or deficient in some way. Instead, they allege what they call an intentional act of self-entrenchment. Although plaintiffs call this action "fundamentally unfair," they fail to identify the fundamental right that is at stake.[22] When a challenged law does not abrogate a fundamental right, it violates substantive due

---

[22]There is no fundamental right to term limits. While term limits have a place in American tradition, they are not "deeply rooted," nor is there a consensus as to their benefits. Many states and the federal government lack legislative term limits. In *Thornton*, 514 U.S. 779, 115 S. Ct. 1842; 131 L. Ed. 2d 881 (1995), the Supreme Court made clear that there is no constitutional right to term limits (state's attempt to impose term limits on its representatives to the United States Congress and Senate was an improper addition to the qualifications clauses of the Constitution). Nor is there a fundamental right to be governed by legislators who do not act in their self interest. *See*, *e.g.*, *Vieth v. Jubelirer*, 541 U.S. 267, 124 S. Ct. 1769; 158 L. Ed. 2d 546 (2004).

process only when it is not rationally related to a legitimate government interest. Because the term-limits amendment is rationally related to the purposes of addressing an economic crisis and permitting the electorate to exercise democratic choice, it does not violate substantive due process.

Instead of confronting the rationality and legitimacy of this articulated purpose, plaintiffs, looking perhaps to other areas of civil rights law, argue that defendant' stated purpose is simply a pretext and that the only purpose of Local Law 51 is to perpetuate incumbency. Plaintiffs argue that the term-limits amendment violates substantive due process because it was passed by incumbent politicians acting "purely in their self-interest to manipulate electoral laws solely to perpetuate themselves in office." Pl.'s Reply at 22. The New York State legislature has previously considered this type of question in the context of referenda, and has identified instances in which there exists a purpose to entrench incumbents. These include: increasing the number of votes a legislator is entitled to cast, changing the method of nominating or electing an elective officer, or changing the length of time an officer may serve before having to face an election. *See* Mun. H. R. L. § 23(2). Cities may pass such legislation only by referendum. *See id.* Changing the number of terms that an officer may serve does not insulate that officer from electoral accountability in the manner described in the mandatory referendum provisions. A law that changes the length of

a term an official may serve before having to face reelection

serves to completely "lock out" any challengers. In contrast, the

term-limits amendment does not insulate incumbents from having to

face reelection.

The broad concept of "self-interest" cannot serve as the

boundary between constitutional and unconstitutional legislative

action. Legislators frequently vote on matters that have

consequences for their political life and that serve their own

interests. For example, redistricting plans that may benefit

incumbent officials do not typically violate the Constitution.

*See Vieth v. Jubelirer*, 541 U.S. 267, 124 S. Ct. 1769; 158 L. Ed.

2d 546 (2004) (plurality opinion stating that no judicially

enforceable limit exists on the political considerations that the

State and Congress may take into account when districting);

*George v. City of Cocoa*, 78 F.3d 494 (11th Cir. 1996) (rejecting

claim that self-interest of incumbent legislator voting on

redistricting plan warranted disqualification of his vote). All

laws voted on by incumbents intending to run for reelection may

benefit incumbents, to the extent that legislators ground their

reelection bids on their performance in office.

Due to the high reelection rate for incumbents (98% in New

York City over the past 10 years),[23] an extension of term limits

---

[23] Swain Aff. at ¶ 2(b)-(c) (reviewing the results of all primary and
general election races for the 51 seats on the City Council that have taken
place in the last 10 years, and finding that incumbents won 105 of the 107
races in which they sought reelection. Furthermore, one of the two candidates
to defeat an incumbent had previously held the same office he sought in that

may well result in an extension of legislators' time in office.
Thus, argue plaintiffs, when legislators vote to extend term
limits, the effect of their vote is to extend their hold on
power. However, permitting incumbents to run for reelection does
not amount to entrenchment. The election is a basic check against
entrenchment, enabling the voters to hold legislators accountable
for their performance in office.

Plaintiffs' allegations that the amendment "is plainly and
explicitly motivated by the desire of the Mayor and the current
batch of second-term Council Members to maintain their hold on
power," Pl.'s Memo. at 44, has no foundation in the record.
Plaintiffs point to the timing of Local Law 51, passed more or
less on the eve of an election, and suggest that legislators are
keen to maintain their hold on power. Defendants, however, can
also point to timing, stating that now is the time that we need
experienced leaders to deal with the current fiscal crisis. Who
is right? The voters, not the courts will decide. Because the
substantive due process standard requires only that this court
find "plausible" reasons for the legislation, the possibility
that there were allegedly improper motivations is immaterial.

Plaintiffs make much of the fact that the Mayor and various
Council members have stated that they intend to amend the term-
limits law after the next election cycle to return to the two-

race).

term limit. Plaintiffs state that this "one time only deal"
violates due process. Plaintiffs cite various newspaper articles
to support their position. Assuming this claim is true, it does
not change the analysis. To permit this particular group of
legislators and City officials to run for reelection and thereby
offer the voters the chance to select seasoned leaders at a time
when the economic position of the City must be dealt with serves
a legitimate government purpose.

Because no fundamental right was infringed, and because the
term-limits amendment bears a rational relationship to a
legitimate government purpose, no reasonable fact finder could
conclude that defendants had violated plaintiff's substantive due
process rights. Defendants' motion for summary judgment on Claim
IV is granted.


**D. State and Municipal Law Claims**

Defendants request that, pursuant to 28 U.S.C. § 1367(c),
this Court decline to exercise supplemental jurisdiction over the
plaintiffs' state law claims if the constitutional claims are
dismissed. *See Giordano v. City of New York*, 274 F.3d 740, 754
(2d Cir. 2001). Defendants argue that dismissal is appropriate
since no discovery has been taken, and, as a result, judicial
economy and fairness will not be harmed. However, declining to
exercise jurisdiction over plaintiffs' state law claims in this
case would not further fairness or judicial efficiency. Both

sides have fully briefed and ably argued all claims, both State and Federal. State law is clear in its requirement that these claims must be dismissed. *See Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350, 98 L. Ed. 2d 720, 108 S. Ct. 614 (1988) (noting that in determining whether to exercise supplemental jurisdiction, a court should consider judicial economy, convenience, fairness, and comity); *Raucci v. Town of Rotterdam*, 902 F.2d 1050, 1055 (2d Cir. 1990) (finding supplemental jurisdiction appropriate where the case "merely applies recently settled [State law] and does not involve novel legal questions"); *see also Mauro v. Southern New Eng. Telcomms., Inc.*, 208 F.3d 384, 388 (2d Cir. 2000) (upholding district court's grant of summary judgment on state law claims because neither efficiency nor complex legal issues required remand). Accordingly, I proceed to consider plaintiffs' state law claims.

*1. New York State Constitution (Claim V)*

Plaintiffs' claim pursuant to the New York State Constitution parallels their claims under the First Amendment to the United States Constitution. Article I, Section I of the New York State Constitution provides that "[n]o member of this state shall be disfranchised, or deprived of any of the rights or privileges secured to any citizen thereof, unless by the law of the land..." N.Y. Const. Art. I, § 1. Plaintiffs allege that "New York Citizens are disenfranchised when they are prevented from

effectively participating in the democratic process." Am. Compl. at ¶ 243. By "negating [the votes cast in the 1993 and 1996 referenda], the Mayor and City Council have rendered these millions of votes moot." *Id*. at ¶ 246. Plaintiffs further claim that, by refusing to submit the question of term limits to the voters in a third referendum, the City Council has disenfranchised the voters of New York. *Id*. at ¶ 249. Defendants respond that while the extension of term limits may alter the make-up of the pool of potential candidates, it has no effect on the voter's ability to vote. Def.'s Reply at 7, n. 4.

To the extent that plaintiffs assert a claim that the voters have been denied the right to vote effectively, that claim fails, as discussed in connection with the Federal First Amendment claims above. To the extent that plaintiffs assert a claim that the voters have been disenfranchised by defendants' illegal refusal to hold a referendum on the term-limits law, that claim rests on State law. Since I conclude, for reasons stated below, that State law does not require a referendum in order to alter term limits, plaintiffs have not been disenfranchised. Defendants' motion for summary judgment is granted on Claim V.

*2. Membership or Composition (Claim VI)*

Plaintiffs argue that matters subject to mandatory referendum by Municipal Home Rule Law § 23 and Charter § 38 serve as a check against local elected officials, removing matters of

self-interest from their discretion and vesting power over those issues in the voters. Plaintiffs claim that the term-limits amendment falls within the purview of these provisions. In Claim VI, plaintiffs claim that under the Municipal Home Rule Law, the term-limits amendment changed the membership of the City Council, changed the term of office, and curtailed the powers of those who will remain junior members of the Council, thereby triggering the corresponding mandatory referendum provisions.

Municipal Home Rule Law § 23(b)(2) requires a referendum whenever a local law, "in the case of a city, town or village, changes the membership or composition of the legislative body or increases or decreases the number of votes which any member is entitled to cast." N.Y. Mun. H.R.L. § 23(b)(2). Plaintiffs and defendants disagree about the meaning of this text. Plaintiffs maintain that the "membership" of a legislative body "changes" when new legislators are seated within the body. Defendants claim that the phrase refers to structural changes rather than those that alter qualifications for individuals to serve in the legislative body.

Defendants' interpretation is amply supported by evidence of legislative intent and the case law. In 1961, the New York State legislature enacted Section 1008 of the Optional County Government Law, which provided that if a city elected to withdraw from the jurisdiction of its civil service commission and adopt the county civil service commission, "the membership of the

county civil service commission shall... be increased to five members, all of whom shall be appointed by the county manager, and not more than three of whom shall at the same time be adherents of the same political party." Optional County Govt. Law, § 1008, quoted in *Caparco v. Kaplan*, 38 Misc. 2d 1058, 1060; 237 N.Y.S.2d 448 (Sup. Ct. Monroe County 1963). It is unlikely that the legislature radically revised its understanding of the term "membership" between 1961 and 1963. Hence, the 1963 legislature, which passed the Municipal Home Rule Law, conceived of the term "membership" as referring to structural characteristics, including the number of persons in the legislative body.

New York courts have considered the question of legislative changes to term limits rules several times, and in no case have they discussed the question whether a change in eligibility criteria changes the membership or composition of a legislative body. *See Holbrook v. Rockland County*, 260 A.D.2d 437; 687 N.Y.S.2d 722 (2d Dept. 1999) (change to an eligibility criterion for office did not require a mandatory referendum under the "term of office" and "curtailment" provisions of Municipal Home Rule Law § 23(2)); *Haskell v. Pattison*, 2001 NY Slip Op 40134U, 2001 N.Y. Misc. LEXIS 367 (Sup. Ct. Rensselaer Co. 2001) (initiative petition seeking to require mandatory referenda for all changes to term limits rules was invalid because it added to the list of matters that must be decided by mandatory referenda, foreclosed

by the fact that term limits do not implicate the "term of
office" provision); *Golden v. N.Y. City Council*, 305 A.D.2d 598;
762 N.Y.S.2d 410 (2d Dept. 2003) (*Golden II*)(a change to the
number of term limits does not implicate the "term of office" or
"curtailment" provisions of § 23).

Plaintiffs cite language in *Forti v. New York State Ethics
Commission*, 75 N.Y.2d 596, 555 N.Y.S.2d 235, 242 (1990), in which
the Court of Appeals stated in a completely different context
that "the Legislature... is reconstituted every two years with an
attendant change in membership, political orientation, and
priorities," *id.* at 613, as support for the proposition that
"membership" refers to the individual members of the City
Council. An "attendant" change in membership, political
orientation, and priorities simply refers to the usual effect of
periodic popular elections.

*3. Form or Composition (Claim VII)*

In Claim VII, plaintiffs claim that under the City Charter,
the term-limits amendment changed the form of the Council,
changed the term of office, and curtailed powers of junior
Council members, and therefore a referendum is required. City
Charter § 38(1) requires a referendum for a law that "...changes
the form or composition of the council..." In their complaint,[24]

---

[24]Plaintiffs do not discuss this claim in their papers.

plaintiffs claim that this clause applies to changes that alter the eligibility of a class of sitting City Council members, thereby reshaping the identity of the body as a whole. Defendants cite two cases in which New York courts found that the form or composition of a legislative body was changed; in both cases, the phrase referred to the structure of the body, not its 'identity.' *See Mehiel v. County Bd. of Legislators*, 175 A.D.2d 109; 571 N.Y.S.2d 808 (2d Dept. 1991); *See Lane v. Johnson*, 283 N.Y. 244; 28 N.E.2d 705 (1940); *Graham v. Bd. of Supervisors*, 25 A.D.2d 250; 269 N.Y.S.2d 47 (1966). Plaintiffs maintain that if the 35 term-limited City Council members remain in office, the makeup of the Council will remain stagnant. Plaintiffs offer no evidence for the principle that altering the eligibility criteria for the legislature changes its "form or composition." The term-limits amendment did not alter the "form or composition" of the City Council.

*4. Changing the Term of Office or of an Elective Officer (Claims VI and VII)*

Municipal Home Rule Law § 23(2) requires a referendum when a local law "...changes the term of an elective office." City Charter § 38(4) similarly requires a referendum when a local law "...changes the term of an elective officer."[25] Plaintiffs claim that the "term of an elective office" refers to the total amount

---

[25]These two requirements are substantially the same.

of time an elected officer may serve. Under this interpretation, the term-limits amendment changed the term of office from eight to twelve years, thus triggering the referendum requirement. Defendants claim that laws that change the number of times a person may seek office do not change the length of a term of office and do not require voter approval.

Defendants point to *Benzow v. Cooley*, 12 A.D.2d 162; 209 N.Y.S.2d 364 (4th Dept. 1961), in which the Appellate Division found that a referendum was not required when the Buffalo City Council amended the city charter to permit the Mayor of Buffalo to serve two consecutive terms in office, where the term-limit provision forbidding such service had been adopted by referendum. The Fourth Department, interpreting Municipal Home Rule Law § 23, held that the term for mayor was still four years, and therefore the term of an elective office had not been changed. *Id*. at 164. The Court of Appeals affirmed, ruling that the change in the term-limits law was not subject to mandatory referendum under the City Home Rule Law. 9 N.Y.2d at 889. Defendants argue that there is no material distinction between Local Law 51 and the law addressed in *Benzow*.

Plaintiffs cite *Roth v. Cuevas*, 158 Misc. 2d 238; 603 N.Y.S.2d 962, 968 (Sup. Ct. New York County 1993), in which the court ruled that the 1993 term-limits law could legally be submitted to a referendum, denying a challenge that the referendum was beyond the City's lawmaking powers. In *Roth*, the

court found that a referendum could decide the issue of
term-limits because "[t]he term law... relates to 'terms of
office' of a public officer." *Id.* at 246. In making this finding,
the court interpreted § 10 of the Municipal Home Rule Law, which
governs the matters on which a municipal government may
permissibly legislate. Plaintiffs claim that this finding applies
equally to Municipal Home Rule Law § 23, which governs mandatory
referenda, despite the difference in standards between the two
different statutes (§ 10 requires that a law "relate" to certain
topics, whereas § 23 requires that a law make "changes" in
certain areas). Plaintiffs argue that *Roth* abrogated *Benzow*'s
narrow interpretation of a "term" with its finding that term
limits are "certainly, rationally related to 'terms of office' of
a public officer." 603 N.Y.S.2d at 968. Defendants argue that the
holding of *Roth* states only that certain provisions "relate" to
the term of office, which does not require a finding that term-
limits legislation requires a referendum based on the term of
office clause. Defendants note that the decision in *Golden v.
N.Y. City Council*, 305 A.D.2d 598; 762 N.Y.S.2d 410 (2d Dept.
2003) (*Golden II*), in which the Appellate Division, Second
Department, cited *Benzow* as good law, did not cite *Roth* (despite
the fact that plaintiffs in that case made the same argument as
is presented here, Kitzinger Aff. Ex. D), and held that a
referendum was not required because the length of the term of
office was not changed. *Id.* at 600.

Plaintiffs attempt to distinguish *Golden II*. Section 25(a) of the Charter mandates that, every twenty years, the usual four-year term is split into two two-year terms, in order to accommodate redistricting after a census. Read in conjunction with Charter § 1138, which capped City officials to two terms, section 25(a) resulted in some City officials being limited to six years in office. In response, the City Council amended § 1138 to specify that only a four-year term would qualify as a "full term" in office for the purposes of the term-limits law. A two-year term not accompanied by a second two-year term was rendered a nullity. As a result, an affected official could serve two two-year terms and a four-year term, or even a two-year term followed by two four-year terms. *See Golden v. New York City Council*, 196 Misc. 2d 276, 280; 765 N.Y.S.2d 135 (Sup. Ct. New York County 2003)(*Golden I*). In *Golden II*, the Appellate Division considered a challenge to this amendment on the ground that a referendum was required to change the term of office from two to four years. In upholding the law, the Court found that Local Law 27 "merely amended the term-limit provisions of the City Charter without changing the length of the term of office." 305 A.D.2d at 599. The Court stated that the purpose of the law was "[t]o correct th[e] 'unequal disqualification'" that fell on the Council members limited to six years. *Id*. Plaintiffs characterize this case as reconciling two City Charter provisions that had created an anomalous result in the application of the two-term

limit requirement, rather than one legitimizing the Council's amending of term-limits provisions without a referendum. However, the opinion clearly states that altering term limits does not trigger the mandatory referendum provisions of the Municipal Home Rule Law or the City Charter.

This Court is obliged to heed the holding of *Golden II* that a law changing the definition of a term from two years to four years and changing the maximum amount of time an official can serve from eight to ten years does not change the "term of an elective officer." 305 A.D.2d at 599. "[S]tate courts are the ultimate expositors of state law," and federal courts "are bound by their constructions except in extreme circumstances not present here." *Mullaney v. Wilbur*, 421 U.S. 684, 691; 95 S. Ct. 1881; 44 L. Ed. 2d 508 (1975) (citing *Murdock  v. City of Memphis*, 20 Wall. 590 (1875); *Winters v. New York*, 333 U.S. 507 (1948)); *see also Arizonans for Official English v. Ariz.*, 520 U.S. 43, 48; 117 S. Ct. 1055; 137 L. Ed. 2d 170 (1997) ("Federal courts lack competence to rule definitively on the meaning of state legislation.").  In this case, the law changes the maximum amount of time an official can serve from eight to twelve years, but the length of each term remains four years. Local Law 51 did not change the term of office or the term of an elected official within the meaning of New York law.

*5. Curtailment (Claims VI and VII)*

Municipal Home Rule Law § 23(2)(f) and Charter § 38(5)
contain parallel provisions requiring a referendum whenever a
local law "[a]bolishes, transfers or curtails any power of an
elective officer." Plaintiffs contend that the term-limits
amendment reduces the power of current junior Council members by
maintaining their junior status within a body that allocates
power based on seniority. Sixteen Council members, if reelected,
would have risen to positions of seniority after the next
election cycle, following the departure of thirty-five Council
members who were prohibited by term limits from running for
reelection. These sixteen members will now remain junior,
presuming the reelection of incumbents running for reelection.
Plaintiffs further allege that if the Mayor follows through on
his stated intention to reinstate the two-term limit, these
junior members will never rise to positions of authority.
Defendants argue that curtailments occur only when a law makes a
structural change that directly diminishes the powers and
authority of an office, rather than one that changes the
prospects of an individual officeholder for future advancement.

The curtailment claim is foreclosed by the decision of the
Appellate Division in *Golden II*, *supra*. The trial court in that
case found that the law permitting Council members who had
already served six years in two terms to serve another term had
curtailed the powers of junior members of the Council who would
then be foreclosed from rising to positions of authority in the

Council. *Golden I*, 196 Misc. 2d at 287-88. The Appellate Division disagreed, holding that the law "merely amended the term-limit provisions of the City Charter without... curtailing any power of the office." 305 A.D.2d at 600. Given that the Appellate Division considered and rejected the same argument as that presented by petitioners in this case, the curtailment claim must be dismissed.

Plaintiffs cite *Heeran v. Scully*, 135 Misc. 874; 240 N.Y.S. 2, *aff'd* 229 A.D. 822, 242 N.Y.S. 901 (3d Dept.), *aff'd*, 254 NY. 344 (1930), in which the court ordered a referendum for a law that added two additional seats to the then three-member Board of Public Safety. The court found that the increase of members of the Board curtailed the powers of the three original members of the Board "as a practical matter," by diluting their voting power. *Id*. at 875. Plaintiffs maintain that, just as in *Heeran*, junior Council members who would have risen to positions of authority will have their powers curtailed when the current holders of those positions remain in their seats. However, *Heeran* does not stand for the proposition that changing an individual's ability to carry out his intentions in office amounts to a curtailment. In *Mayor of the City of New York v. Council of the City of New York*, 9 N.Y.3d 23, 874 N.E.2d 706; 842 N.Y.S.2d 742 (2007), the Mayor challenged two local laws that required the Mayor to bargain directly with unions representing certain fire department employees, arguing that they curtailed his power

because he had less flexibility in bargaining as a result of the laws. *Id*. at 32. The court disagreed, stating that the curtailment rule applied only to legislation that "impairs a power conferred on the officer as part of the framework of local government." *Id*. at 33. Even without the imperative of *Golden II*, *Mayor of the City of New York* indicates that the term-limits amendment does not diminish the formal powers of the office, as each member retains all of his or her authority as a member of the City Council, the only relevant consideration for curtailment purposes.

*6. Fundamental Change / Self-Interest (Claim VIII)*

Plaintiffs allege that, taken together, the mandatory referendum provisions of § 23 of the Municipal Home Rule Law and § 38 of the City Charter require that fundamental changes to a municipality's electoral and governmental structure must in all cases be submitted to and approved by the electorate before those changes can become law. Plaintiffs characterize these provisions as showing a "clear statutory intent to remove matters of self-interest, such as laws affecting the governmental and electoral structure and the powers of elected officials, from the sole discretion of elected officials and vest them instead in the sole discretion of the voters." Am. Compl. at ¶ 301. Plaintiffs state that the issue of term limits is "consistent" with those specified in the mandatory referendum provisions listed in the

Municipal Home Rule Law and City Charter. *Id*. at ¶ 302.
Plaintiffs do not offer any authority for this interpretation of
the purpose and extent of the mandatory referendum provisions.
The concept of "self-interest" is too vague and broad to serve
meaningfully as the dividing line between matters that may be
decided by the legislature and matters that must be decided by
the electorate. *See* discussion on "self-interest" in the section
on plaintiffs' Fourteenth Amendment claim, *supra*.

*7. Public Policy (Claim IX)*

Plaintiffs claim that a public policy established by New
York City voters in the 1993 term-limits referendum cannot be
repealed by the City Council. As enacted in 1993, Section 1137 of
the Charter states that it is the "public policy of the City of
New York to limit to not more than eight consecutive years" the
time that certain City officials can serve, "so that elected
representatives are 'citizen representatives' who are responsive
to the needs of the people and are not career politicians."
Charter § 1137. The legislature has the power to change a public
policy stated in a law, regardless of whether it was enacted by
referendum. *See Caruso*, 136 Misc. 2d at 895-96 ("laws proposed
and enacted by the people under an initiative provision are
subject to the same constitutional, statutory, and charter
limitations and those passed by the legislature and are entitled
to no greater sanctity or dignity."). Plaintiffs reallege their

theory, made in Claim VIII, that the statutory intent of the referendum provisions of the City Charter is to remove matters of self-interest from the sole discretion of elected officials. For the reasons stated above, this claim lacks merit.

Since no reasonable fact finder could conclude that a mandatory referendum was required under New York State law to pass the term-limits amendment, defendants' motion for summary judgment on Claims VI, VII, VIII, and IX is granted.

## E. Conflict of Interest Claims (Claims X, XI, and XII)

Plaintiffs make three claims based on the conflict of interest provisions in the City Charter. Chapter 68 § 2604(b)(3) of the City Charter provides, in relevant part, that "[n]o public servant shall use or attempt to use his or her position as a public servant to obtain any financial gain... or... private or personal advantage, direct or indirect, for the public servant." Chapter 68 § 2604(b)(2) provides, in relevant part, that a City public servant may not have "any financial or other private interest, direct or indirect, which is in conflict with the proper discharge of his or her official duties." Plaintiffs maintain that the enactment of the term-limits amendment contravenes these conflicts provisions, because to determine one's own ability to remain in public office is to use one's position to gain 'personal advantage.' Plaintiffs further allege

that those who voted in favor of the term-limits amendment will gain financially, because they will receive higher salaries, significant benefits packages, and financial allowances. Second, plaintiffs allege that the Mayor and City Council violated the conflicts provisions by making an agreement with term-limits proponent Ronald Lauder to support the term-limits amendment in exchange for a seat on a Charter revision commission to put the term-limits issue back on the ballot after the election.

Defendants respond that Chapter 68 of the City Charter does not provide a private right of action. Second, defendants state that before the term-limits amendment was considered by the City Council, the New York City Conflicts of Interest Board (the "Board") exercised its authority under Chapter 68 and rendered an advisory opinion stating that Chapter 68's conflict of interest standards do not prevent Council members from considering and voting on legislation that would allow incumbents to seek another term. *See* COIB Op. 2008-3. Defendants urge the Court to give deference to the Board's opinion. Last, defendants argue that Chapter 68 was intended to prevent City officials and employees from misusing City government positions to gain financial and personal advantages in their private lives, not to penalize officials for voting on matters of public concern.

*1. Private Right of Action*

When a legislative body adopts a regulatory scheme, it may

decide whether to "give[] a cause of action to a person injured by its violation." *Burns Jackson Miller Summit & Spitzer v. Lindner*, 59 N.Y.2d 314, 324; 451 N.E.2d 459; 464 N.Y.S.2d 712 (1983) (citation omitted). Where the legislature does not "specify in the statute itself... whether private litigants are intended to have a cause of action," courts must ascertain legislative intent. *Id.* at 325. The Court of Appeals has established a three-part test, known as the *Sheehy* test, to determine whether a private right of action may be fairly implied from legislation that is silent on the subject. A court must assess:

> (1) whether the plaintiff is one of the class for whose particular benefit the statute was enacted; (2) whether recognition of a private right of action would promote the legislative purpose; and (3) whether creation of such a right would be consistent with the legislative scheme.

*Uhr v. East Greenbush Cent. Sch. Dist.*, 94 N.Y.2d 32, 38; 720 N.E.2d 886; 698 N.Y.S.2d 609 (1999) (citing *Sheehy v. Big Flats Cmty. Day, Inc.*, 73 N.Y.2d 629, 633; 541 N.E.2d 18; 543 N.Y.S.2d 18 (1989)).

*a. Class for Whose Benefit the Statute was Enacted.*

Defendants argue that laws protecting the public in general do not create a private right of action.[26] Plaintiffs do not seek to

---

[26]Defendants cite *O'Connor v. City of N.Y.*, 58 N.Y.2d 184 (1983) for the proposition that a statute protecting "all members of the general public similarly situated" does not satisfy the first prong of the *Sheehy* test. Id. at 190. This case is distinguishable. In *O'Connor*, plaintiffs sought to hold a municipality liable for its failure to properly inspect a gas line that subsequently exploded, killing a dozen people. The court did not apply the

enforce specific penalties provided for by Chapter 68, nor do they ask the court to impose liability or damages. Rather, they seek a declaratory judgment that the term-limits amendment must be declared void. New York courts admit claims by citizens arguing on public policy grounds when laws are tainted by a conflict of interest. In *Tuxedo Conservation & Taxpayers Ass'n. v. Town Bd. of Tuxedo*, 69 A.D.2d 320; 418 N.Y.S.2d 638 (2d Dept. 1979), the Appellate Division annulled a vote by a town board approving a development project due to the appearance of a conflict, where the deciding vote was cast by a member that had a financial interest in the development. *Id.* at 326. The plaintiffs included citizens of the town and good government groups. Other cases addressing claims made by citizens on conflicts grounds have assumed that plaintiff citizens are permitted to bring such claims. *See*, *e.g.*, *Peterson v. Corbin*, 275 A.D.2d 35; 713 N.Y.S.2d 361 (2d Dept. 2000) (assuming that a citizen plaintiff had a right to ask the court to enjoin a legislator from voting on a matter that plaintiff claimed presented a conflict of interest). Under New York law, citizens are among the class of persons protected by certain public interest statutes, such as conflicts statutes, when the remedy sought is voiding legislation.

---

*Sheehy* test, but rather assessed whether the City owed a duty to exercise care for a particular class of individuals, absent which no liability could be imposed for failure to enforce a statute or regulation. 58 N.Y.2d at 189.

*b. Legislative Purpose.* Chapter 68 states its goals as follows: "These prohibitions on the conduct of public servants are enacted to preserve the trust placed in the public servants of the city, to promote public confidence in government, to protect the integrity of government decision-making and to enhance government efficiency." Charter § 2600. Recognition of a private right of action in this case would promote the legislative purpose of promoting good government. If indeed the enactment of the term-limits amendment violated conflicts laws, then voiding the legislation serves the goal of preserving the public trust.

*c. Legislative Scheme.* Chapter 68 establishes an enforcement scheme, giving the Board authority to promulgate rules necessary to implement Chapter 68, issue opinions, direct investigations, conduct hearings, and penalize officials for misconduct. *See* Charter § 2603. Where the Legislature has contemplated administrative enforcement of the statute, "[t]he question then becomes whether, in addition to administrative enforcement, an implied right of action would be consistent with the legislative scheme." *Uhr v. East Greenbush Cent. Sch. Dist.*, 94 N.Y.2d 32, 40; 720 N.E.2d 886; 698 N.Y.S.2d 609 (1999). When the legislature commits a "comprehensive statutory enforcement scheme" to certain government entities, "recognition of a private civil right of action is incompatible with the mechanism chosen by the Legislature." *Hammer v. American Kennel Club*, 1 N.Y.3d 294, 300;

803 N.E.2d 766; 771 N.Y.S.2d (2003).

In this case, a private right of action to seek a declaratory judgment against city officials alleging violations of the conflicts laws is not inconsistent with the statutory enforcement scheme. The Board is empowered to render advisory opinions "on the request of a public servant or a supervisory official of a public servant and shall apply only to such public servant." Charter § 2603 (c)(1). When the Board determines that there has been a violation of the conflicts rules and recommends a penalty for an elected official to an agency, the agency "shall report to the board what action" was taken. Charter § 2603 (h)(3). The Board is not permitted to impose penalties against members of the City Council, but "may recommend to the council such penalties as it deems appropriate." *Id*. Chapter 68 does not mention appeal or judicial review of the Board's decisions. There is no indication that a private right of action would be incompatible with the Charter's enforcement mechanism for conflicts violations. The Board is an advisory one. Agencies are permitted to make independent decisions about conflicts issues. Nothing about the enforcement structure indicates that it would be prejudiced by a private right of action. Accordingly, I find that the *Sheehy* test has been met and there is a private right of action under Charter § 68.


*2. Whether the City Council and the Mayor Violated Conflicts*

*Rules*

The advisory opinions of the Board "should be given considerable weight by the courts." *Di Lucia v. Mandelker*, 110 A.D.2d 260, 263; 493 N.Y.S.2d 769 (1st Dept. 1985). Before the Council's vote on the term-limits amendment, three plaintiffs asked the Board for an advisory opinion on whether Chapter 68 allowed them to "participate in the consideration of currently-pending legislation to alter the City Charter's term limits provisions." COIB Op. at 1. The Board wrote that legislators would not violate Chapter 68 "by participating in the legislative process in relation to the modification, extension, or abolition of term limits, including but not limited to voting for or against any such changes." *Id*. at 11. The Board determined that Chapter 68 is concerned with "conflicts between public servants' official duties and, in the main, their private financial interests... not their political interests in serving as public officials or in the terms and conditions of that service." *Id*. at 5. The Board distinguished prior opinions cited by plaintiffs because the conflicts in those cases involved an official's "personal, private interest, not an interest in the terms and conditions of his or her public office." *Id.* at 8. The Board also rejected plaintiffs' argument that salaries and other compensation attached to elective office would constitute a "private or personal advantage" under § 2604(b)(3), stating that if Council members were prohibited from voting on such matters,

"it must follow that they could not vote on any measure affecting the terms and conditions of their public service as Council Members, including pay raises, campaign contributions, and lobbyist gift giving," which Council members clearly have the power to do. *Id*. at 8-9. The Board additionally cited *Golden II* for the proposition that it is within the authority of the Council to enact laws regarding term limits.

The decision of the conflicts Board was correct. As the Board found, holding that elected officials may not act on legislation properly before them if their actions would have implications for their own political prospects "would bring democratic government to a halt." COIB Op. at 9. The "benefits" incurred by Council Members voting on this amendment were not private ones, rendering inapposite the caselaw and prior opinions cited by plaintiffs. The one case cited by plaintiffs concerning an election-related conflicts issue addressed legislative activity outside of the legislators' "core legislative function" of voting on legislation. *Id*. at 6.[27]

---

[27]Plaintiffs cite a case where the Board advised Council members that they could use City resources to conduct voter registration drives, as long as no partisan material was distributed. COIB. Op. 95-24. The Board stated that the drive "must be conducted in a way which makes it clear that none of the activities associated with the drive are designed to promote the private political interests of the individual Council Members or other elected officials or candidates for office." *Id*. at 2. Plaintiffs argue that City Council members acted on their private political interests when they voted on the term-limits amendment. The two cases are not comparable. In the voter registration case, the Board ensured that during an unusual activity taking place outside of the legislature's ordinary ambit, no public money would be used to fund individual reelection campaigns or to benefit one political party. The term-limits amendment does not single out individual City Council members for benefits. Council members will benefit from the law in a  manner

Plaintiffs additionally claim that the Mayor violated Charter §§ 2604(b)(2) and (b)(2) when he allegedly promised to appoint term-limits advocate Ronald Lauder to a Charter revision commission to put the term-limits issue back on the ballot after the next election cycle. Plaintiffs allege that the Mayor offered this position to Mr. Lauder in order to pacify Mr. Lauder's potentially powerful (and well funded) opposition to the term-limits amendment. The City Council inserted language into the term-limits amendment stating that the amendment would be deemed repealed following a referendum on a Charter amendment to return to a limit of two terms, which plaintiffs allege was part of the plan to address Mr. Lauder's concerns. Plaintiffs offer no admissible evidence to support these claims.[28] Furthermore, even if true, these claims do not establish a violation of Chapter 68. The Mayor's alleged 'benefit' was a former opponent's support for a piece of legislation, not a personal or financial reward in his private capacity.

No reasonable fact finder could conclude that defendants' actions violated New York City's conflict of interest provisions. Defendants' motion for summary judgment on Claims X, XI, and XII of the complaint is granted.

---

no different than if they had passed legislation increasing their own salaries.

[28]Plaintiffs cite various newspaper articles, which do not meet the requirements of Federal Rules of Civil Procedure 56 regarding admissible evidence that can form a basis of a summary judgment motion. *See* Fed. R. Civ. Pro. 56(e)(1).

**CONCLUSION**

For the reasons stated above, defendants' motion for summary judgment is granted on all claims. The motions to file briefs as *amici curae* by the Partnership for New York City, Inc., Lenora B. Fulani, and New York City Organizations of the Independence Party are dismissed as moot. The clerk is directed to transmit a copy of the within to all parties and the assigned Magistrate Judge, and to enter judgment dismissing plaintiffs' complaint.


SO ORDERED.

Dated :    Brooklyn, New York
           January 13, 2008


                    By: /s/ Charles P. Sifton (electronically signed)
                         United States District Judge